DETROIT EDISON COMPANY v DEPARTMENT OF TREASURY

Docket No. 309732. Submitted December 4, 2013, at Lansing. Decided
January 9, 2014, at 9:05 a.m. Leave to appeal sought.

The Detroit Edison Company brought an action in the Court of
Claims against the Department of Treasury, seeking, in part, a
refund of use taxes paid under protest for the tax period
January 1, 2003, through September 30, 2006. Plaintiff alleged
that the machinery and equipment that had been subjected to
the tax was exempt from taxation under the industrial-
processing exemption of the Use Tax Act (UTA), MCL 205.94o,
because the machinery and equipment, which is located outside
its generation plants, is used both to transmit and distribute the
electricity and to continue the processing of the electricity. The
Court of Claims, Paula J. M. Manderfield, J., granted summary
disposition in favor of plaintiff. Defendant appealed.

The Court of Appeals *held*:

1. Plaintiff's machinery and equipment located outside its
generation plants are used in the activity of converting and
conditioning electricity by changing the quality, form, character, or
composition of the electricity for ultimate sale at retail up until the
time the electricity reaches its customers' meters, at which point it
becomes a finished good. The terms "form, composition, quality,
combination, or character" in MCL 205.94o(7)(a) are sufficiently
broad and expansive so as to encompass voltage and current
changes in electricity as it travels through the transmission and
distribution system. Electricity is not a finished good ready for sale
until it reaches the meters of plaintiff's customers.

2. Industrial processing occurs when the machinery and equip-
ment at issue are used to inspect, test, and control the quality of
electricity as it flows through the transmission and distribution
system.

3. In a situation like the one in this case, where machinery and
equipment are concurrently used in a unified system for both
distribution and industrial processing, the industrial-processing
exemption applies to the machinery and equipment in full. Con-

current taxable use with an exempt use does not remove the protection of the exemption. Plaintiff is entitled to the industrial-processing exemption in full.

4. Mich Admin Code, R 205.115(4), which would clearly preclude the exemption sought by plaintiff, conflicts with the Court of Appeals' interpretation of the industrial-processing exemption of the UTA. The rule is invalid and unenforceable.

Affirmed.

TAXATION — USE TAX ACT — WORDS AND PHRASES — INDUSTRIAL PROCESSING.

"Industrial processing" for purposes of the industrial-processing exemption in the Use Tax Act, includes the activities of inspection, quality control, or testing to determine whether particular units of materials or products or processes conform to specified parameters at any time before materials or products first come to rest in finished goods inventory storage; "industrial processing" means the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail; industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage (MCL 205.94o(3)(d) and (7)(a)).

*Honigman Miller Schwartz and Cohn LLP* (by *John D. Pirich, Patrick R. Van Tiflin, Lynn A. Gandhi,* and *June Summers Haas*) for plaintiff.

*Bill Schuette,* Attorney General, *Aaron D. Lindstrom,* Solicitor General, *Richard A. Bandstra,* Chief Legal Counsel, and *Julius O. Curling,* Assistant Attorney General, for defendant.

Before: MURPHY, C.J., and FITZGERALD and BORRELLO, JJ.

MURPHY, C.J. Defendant, Department of Treasury (Department), appeals as of right the Court of Claims' order granting summary disposition in favor of plaintiff, Detroit Edison Company (DTE). This action involves the question

whether DTE's machinery and equipment located outside its generation plants and indisputably used to transmit and distribute electricity are subject to taxation under the Use Tax Act (UTA), MCL 205.91 *et seq*. The tax period at issue is January 1, 2003, through September 30, 2006. DTE claims that it is entitled to the UTA's "industrial processing" exemption pursuant to MCL 205.94o, asserting that the machinery and equipment located outside its generation plants are used both to transmit and distribute electricity and to continue the "processing" of electricity. According to DTE, electricity is not a finished good ready for sale and in a usable form for its customers absent the ongoing industrial processing beyond the generation-plant walls, because the electricity leaves the plants at extremely high and unusable voltage levels. DTE further maintains that the machinery and equipment at issue are used to inspect, control the quality of, and test the electricity, which activities all constitute industrial processing that occurs before the electricity takes the form of a finished good. The Department contends that the machinery and equipment alleged to be subject to use tax are employed solely for purposes of distributing and delivering electricity and not for industrially processing the electricity, i.e., the machinery and equipment do not change the quality, form, and character of the electricity. The Department maintains that, given those circumstances, the Legislature clearly did not provide for the exemption being claimed by DTE. We agree with DTE's arguments and hold that DTE is entitled to the claimed "industrial processing" exemption. Accordingly, we affirm the ruling of the Court of Claims.

I. BACKGROUND

DTE is an electric utility that provides electricity to residential, commercial, and industrial customers.

DTE's operations include the production and generation of electricity at its generation plants, along with the transmission and distribution of electricity. The transmission and distribution system, or electric system, is an integrated, interconnected, and interrelated network of machinery and equipment, including, but not limited to, substations, transformers, high-voltage towers, cables, and poles. In its complaint, DTE alleged that the electric system "continues to process the electricity up to, and including, the final transformer prior to the customer's location;" that this "processing of the electricity involves changes to its quality, such as changes in voltage and volt amp reactive levels ('VARs');" that "customers cannot use the electricity until certain levels of voltage and VARs are achieved," which is not met "until the electricity leaves the final transformer in a consumable form at the customer's location;" and that the various items of machinery and equipment in the electric system are used to produce, process, monitor, test, and maintain the electricity, as well as to protect, test, inspect, and control other equipment in the electric system.

Voltage levels at a generation plant range from 15,000 to 25,000 volts, while standard usable levels are from 120 to 240 volts, with some industrial customers running on as much as 480 volts. One DTE expert averred in his affidavit that "[i]t is not practical under the laws of physics . . . for generation plants to produce electricity at the 120/240 volt level as it would require a wire that is 46 [times] greater in circumference than what is available." There is no dispute that once electricity leaves a generation plant, the voltage must be both increased to allow for transmission and decreased to allow for use, which increases and decreases are accomplished through the use of

the machinery and equipment at issue.[1]

The parties submitted documentary evidence consisting of detailed expert opinions, observations, and explanations regarding the nature of electricity, its generation and production, and its transmission and distribution. Of primary significance, the Department's expert opined that "[t]hrough the use of transformers stepping up and stepping down the voltage, the composition and character of the electricity *is not changed*." (Emphasis added.) He indicated that, although transformers and other electrical equipment assist in distributing, transmitting, and delivering electricity to DTE's customers, they do not alter the nature, composition, and character of the electricity. DTE's experts generally opined that the characteristics and quality of electricity *continue to change* in the transmission and distribution phase as brought about by the machinery and equipment located outside DTE's generation plants. In an affidavit, one DTE expert explained, "As it moves through the [e]lectric [s]ystem, the characteristics of electricity continue to change as the [e]lectric [s]ystem experiences load changes (electricity demand), faults and switching spikes." He further averred that after electricity passes through a customer's meter, "the electricity becomes a finished good and is sold to the end user as a retail product." Another DTE expert stated that DTE, in providing electricity to its customers, "engage[s] in continuous processing of the electricity" and "must continuously adjust the voltage and current of the electricity." A DTE expert emphasized that "[a]t

---

[1] A DTE expert testified that "[t]he electricity must go to a step-up transformer, where its voltage is increased to 115,000 to 500,000 volts[;]" "[t]he high voltage is necessary to move [the electricity] . . . closer to [the] customer." He further averred that "[a]s the electricity moves through the [e]lectric [s]ystem, the high voltage must be reduced to connect to lower voltage power lines."

no time does the electric power reach the form, character, composition or specific parameters at which it is usable by the customer of the utility until it reaches the customer's meter."

The relevance of the differences in the experts' positions is that for purposes of the industrial-processing exemption to the use tax, "industrial processing" was defined during the pertinent tax period as follows:

[T]he activity of converting or conditioning tangible personal property *by changing* the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail. Industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage. [MCL 205.94o(7)(a), as added by 1999 PA 117, as amended by 2004 PA 172 (emphasis added).]

In 2009, the Department determined that there had been a use tax deficiency in DTE's payments for the period of January 1, 2003, through September 30, 2006, which adjudged deficiency was based in part on disallowance of DTE's claimed exemptions under MCL 205.94o for machinery and equipment used in industrial processing. Subsequently, DTE paid the use tax bill in full and under protest and it proceeded to file the instant suit for a refund of the use tax payments, alleging that it had been erroneously assessed for the years in dispute.[2] We note that a separate issue in the lawsuit concerned whether the Department had im-

---

[2] DTE had, on its own volition, originally paid use taxes on some personal property without claiming an industrial-processing exemption. As part of the instant lawsuit, DTE sought a refund of those tax payments, along with the demanded refund of the protested use tax

properly assessed use taxes against DTE with respect to purchases allowing access to certain Internet databases for purposes of research and training. This claim was summarily dismissed, and the ruling is not being challenged on appeal. On competing motions for summary disposition filed by the parties, the Court of Claims ruled that DTE was entitled to summary disposition in regard to its claim demanding a tax refund predicated on the UTA's industrial-processing exemption. The Court of Claims stated and explained:

> At the end of the distribution system, the electricity is processed through a final step down transformer at or near the customer's meter, where the voltage is reduced to the 120/240 volt range, which is the range at which the electricity is usable by the customer. The electricity then finally moves through the customer's meter, where it undergoes a final monitoring process to ensure its compliance with regulations.
>
> [The Department] does not dispute the veracity of this process. It is clear that electricity is continuing to be processed up until the point where it reaches the customer's meter, because the voltage and current levels are drastically changed multiple times at set points, the last being at to near the customer's meter, and in between these changes the voltage and current levels are constantly being adjusted to keep them constant. Certainly these types of changes constitute changes to the form, composition, quality, combination, or character of the property.
>
> This conclusion is further solidified by the affidavits of many of [DTE's] witnesses, who have uniformly attested to the fact that the electricity continues to be processed, controlled, and monitored, and that the characteristics and quality of the electricity continue to change up until the point it is finally converted to 120/240 volts at or near the customer's meter.

---

payments made to the Department relative to personal property for which DTE had claimed the industrial-processing exemption.

II. ANALYSIS

A. STANDARD OF REVIEW AND SUMMARY DISPOSITION
UNDER MCR 2.116(C)(10)

This Court reviews de novo a ruling by the Court of Claims on a motion for summary disposition in a case involving the UTA. *Guardian Indus Corp v Dep't of Treasury*, 243 Mich App 244, 248; 621 NW2d 450 (2000). Issues relating to the construction of the UTA are likewise reviewed de novo on appeal. *Id.*

The motions for summary disposition were brought and decided pursuant to MCR 2.116(C)(10). In *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), this Court acknowledged the foundational principles applicable to the analysis of a motion under MCR 2.116(C)(10), stating:

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

### B. STATUTORY INTERPRETATION PRINCIPLES

Generally speaking, tax laws will not be extended in scope by implication or forced construction, and when there is doubt with respect to interpretation, the tax laws are to be construed in favor of the taxpayer. *Brunswick Bowling & Billiards Corp v Dep't of Treasury*, 267 Mich App 682, 685; 706 NW2d 30 (2005); *DeKoning v Dep't of Treasury*, 211 Mich App 359, 361; 536 NW2d 231 (1995) ("Generally, tax laws are construed against the government."). However, tax exemptions under the UTA and in general are disfavored, and the burden of proving an entitlement to an exemption is on the party claiming the right to the exemption. *Guardian Indus*, 243 Mich App at 249. Tax exemptions are strictly construed against the taxpayer because exemptions represent the antithesis of tax equality. *Id.* In *Menard, Inc v Dep't of Treasury*, 302 Mich App 467, 474; 838 NW2d 736 (2013), this Court expressed that tax exemptions are disfavored, will not be inferred from statutory language, and must be proven by the party claiming the exemption. Quoting *Detroit v Detroit Commercial College*, 322 Mich 142, 148-149; 33 NW2d 737 (1948), which quoted 2 Cooley, Taxation (4th ed), § 672, p 1403, the *Menard* panel elaborated:

> An intention on the part of the legislature to grant an exemption from the taxing power of the State will never be implied from language which will admit of any other reasonable construction. Such an intention must be expressed in clear and unmistakable terms, or must appear by necessary implication from the language used, for it is a well-settled principle that, when a specific privilege or exemption is claimed under a statute, charter or act of incorporation, it is to be construed strictly against the property owner and in favor [of] the public. This principle applies with peculiar force to a claim of exemption from taxation. Exemptions are never presumed, the burden is on

a claimant to establish clearly his right to exemption, and an alleged grant of exemption will be strictly construed and cannot be made out by inference or implication but must be beyond reasonable doubt. In other words, since taxation is the rule, and exemption the exception, the intention to make an exemption ought to be expressed in clear and unambiguous terms; it cannot be taken to have been intended when the language of the statute on which it depends is doubtful or uncertain; and the burden of establishing it is upon him who claims it. Moreover, if an exemption is found to exist, it must not be enlarged by construction, since the reasonable presumption is that the State has granted in express terms all it intended to grant at all, and that unless the privilege is limited to the very terms of the statute, the favor would be extended beyond what was meant. [*Menard*, 302 Mich App at 474-475 (quotation marks omitted).]

With respect to the relationship between our interpretation of a statute and the construction given that statute by an administrative agency charged with enforcing it, our Supreme Court observed in *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 117-118; 754 NW2d 259 (2008):

With today's decision, we reaffirm the *Boyer-Campbell* [*Co v Fry*, 271 Mich 282; 260 NW 165 (1935)] standard of review, which provides a long-standing and clear standard for appellate courts to apply to an administrative agency's interpretation of a statute. In accordance with separation of powers principles and this Court's older cases, we hold that agency interpretations are entitled to respectful consideration, but they are not binding on courts and cannot conflict with the plain meaning of the statute. While the agency's interpretation may be helpful in ascertaining the legislative intent, courts may not abdicate to administrative agencies the constitutional responsibility to construe statutes. Giving uncritical deference to an administrative agency would be such an improper abdication of duty.

In *Whitman v City of Burton*, 493 Mich 303, 311-312; 831 NW2d 223 (2013), the Supreme Court recited the standard and well-established principles of statutory construction:

> When interpreting a statute, we follow the established rules of statutory construction, the foremost of which is to discern and give effect to the intent of the Legislature. To do so, we begin by examining the most reliable evidence of that intent, the language of the statute itself. If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is permitted. Effect should be given to every phrase, clause, and word in the statute and, whenever possible, no word should be treated as surplusage or rendered nugatory. Only when an ambiguity exists in the language of the statute is it proper for a court to go beyond the statutory text to ascertain legislative intent. [Citations omitted.]

### C. DISCUSSION

The use tax is an excise tax that is levied on every person in this state for the privilege of consuming, storing, or using tangible personal property in Michigan. MCL 205.93(1); *Podmajersky v Dep't of Treasury*, 302 Mich App 153, 162; 838 NW2d 195 (2013); *Guardian Indus*, 243 Mich App at 249; *Combustion Engineering, Inc v Dep't of Treasury*, 216 Mich App 465, 468; 549 NW2d 364 (1996). The use tax complements the sales tax and was designed to govern transactions that are not covered by the General Sales Tax Act, MCL 205.51 *et seq. Guardian Indus*, 243 Mich App at 249. "[T]he use tax exempts from taxation property on which a sales tax is paid[.]" *Combustion Engineering*, 216 Mich App at 468, citing MCL 205.94(a). "The legal incidence of the use tax falls upon the consumer or purchaser." *Combustion Engineering*, 216 Mich App at 468. Here,

the "tangible personal property" alleged by the Department to be subject to use tax without exemption is the machinery and equipment located outside DTE's generation plants.[3] The tax rate under the UTA is 6% of the price of the property subject to taxation. MCL 205.93(1).

With respect to the "industrial processing" exemption, during the relevant period, MCL 205.94o provided, in pertinent part, as follows:

(1) The tax levied under this act does not apply to property sold to the following after March 30, 1999. . . :

(a) An industrial processor for use or consumption in industrial processing.

(b) A person, whether or not the person is an industrial processor, if the tangible personal property is intended for ultimate use in and is used in industrial processing by an industrial processor.

(c) A person, whether or not the person is an industrial processor, if the tangible personal property is used by that person to perform an industrial processing activity for or on behalf of an industrial processor.

\* \* \*

(3) Industrial processing includes the following activities:

\* \* \*

(d) Inspection, quality control, or testing to determine whether particular units of materials or products or processes conform to specified parameters at any time before materials or products first come to rest in finished goods inventory storage.

\* \* \*

---

[3] We are not addressing a question regarding sales or use tax on electricity itself or on the transmission and distribution of electricity.

4) Property that is eligible for an industrial processing exemption includes the following:

*  *  *

(b) Machinery [or] equipment . . . used in an industrial processing activity . . . .

*  *  *

(6) Industrial processing does not include the following activities:

*  *  *

(b) Sales, distribution, warehousing, shipping, or advertising activities.

*  *  *

(7) As used in this section:

(a) "Industrial processing" means the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail. Industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage.

(b) "Industrial processor" means a person who performs the activity of converting or conditioning tangible personal property for ultimate sale at retail or use in the manufacturing of a product to be ultimately sold at retail. [See 1999 PA 117 and 2004 PA 172.]

The language in MCL 205.94o(7)(a) makes clear that industrial processing must involve the converting or

conditioning of "tangible personal property."[4] The UTA, before the effective date of 2004 PA 172, which was September 1, 2004, defined "tangible personal property," in part, as follows:

> [B]eginning September 20, 1999, [it] includes electricity, natural or artificial gas, or steam and also the transmission and distribution of electricity used by the consumer or user of the electricity, whether the electricity is purchased from the delivering utility or from another provider. [MCL 205.92(*l*), as amended by 2000 PA 391, effective January 3, 2001.]

Pursuant to 2004 PA 172, "tangible personal property" was defined as follows:

> [P]ersonal property that can be seen, weighed, measured, felt, or touched or that is in any other manner perceptible to the senses and includes electricity, water, gas, steam, and prewritten computer software. [MCL 205.92(k).][5]

---

[4] We note, therefore, that the term "tangible personal property" is used, for our purposes, in two different contexts. First, a use tax is levied on tangible personal property, MCL 205.93(1), which property indisputably encompasses the machinery and equipment located outside DTE's generation plants. Second, relevant to the industrial-processing exemption, it is tangible personal property that must be subject to processing by way of a change in the tangible personal property's form, composition, quality, combination, or character for ultimate sale. MCL 205.94o(7)(a). We further note that machinery and equipment in general fits within the parameters of the type of property that might be eligible for the industrial-processing exemption. MCL 205.94o(4)(b).

[5] Further, also pursuant to 2004 PA 172, the Legislature separately provided that "in the same manner as tangible personal property is taxed under [the UTA]," a use tax is imposed on, "[t]he transmission and distribution of electricity, whether the electricity is purchased from the delivering utility or from another provider, if the sale is made to the consumer or user of the electricity for consumption or use rather than for resale." MCL 205.93a(1)(e). There is no argument by the parties that the statutory change in the definition of "tangible personal property" affects the outcome of this litigation and appeal. Further, it is clear that the

Here, the "tangible personal property" implicated by MCL 205.94o is coal, oil, natural gas, and electricity itself. There is no dispute that, in general, DTE is indeed an industrial processor and that it is engaged in industrial processing when using machinery and equipment located within its plants, converting or changing natural resources in the process of generating or producing electricity.[6] The question framed by the parties is whether industrial processing of electricity continues to occur once the electricity leaves a generation plant for purposes of transmission and distribution. Stated otherwise, the issue presented is whether DTE, through the use of its machinery and equipment located outside its generation plants, is engaged in "the activity of converting or conditioning tangible personal property [electricity] by changing the form, composition, quality, combination, or character of the property for ultimate sale[.]" MCL 205.94o(7)(a). Another component of this case is MCL 205.94o(3)(d), which provides, as indicated earlier, that industrial processing includes the activities of "[i]nspection, quality control, or testing to determine whether particular units of materials or products or

Legislature was focused on the taxation of electricity and its transmission and distribution, not the "industrial processing" exemption.

[6] As indicated in an affidavit executed by a DTE expert:

The production of electricity begins at a generation plant. The production begins with the conversion of energy, stored in fuel such as coal, oil or natural gas, into heat. This heat is used to boil water to form steam. The steam is injected into a turbine to cause the turbine blades to create rotations. The turbine shaft is coupled to the shaft of a generator on which a coil of wire is built. As the shaft rotates, other coils of wire remain fixed. A direct current is sent through the coil on the rotating generator shaft and causes a rotating magnetic field within the fixed coils. The rotation of the magnetic field induces a current into the fixed coils. This current is the electric product as produced at the generator. At the generator, the voltage level ranges from 15,000 to 25,000 volts. [Numerals omitted; paragraph format altered.]

processes conform to specified parameters at any time before materials or products first come to rest in finished goods inventory storage." DTE presented extensive documentary evidence indicating that the machinery and equipment at issue are used not only to change the form and character of electricity, but to inspect, test, and control the electricity in order to determine whether it conforms to specified parameters at a time before the electricity becomes a finished good. The documentary evidence reflected that DTE is required to engage in such monitoring to be in compliance with rules and regulations of the Michigan Public Service Commission (MPSC) and federal agencies. A DTE expert averred, "In order to ensure our compliance with the necessary MPSC and other industry standards, regulations and ratings, we must constantly monitor the electricity, as well as monitor the equipment necessary to process and control the electricity[.]" The Department does not cite any documentary evidence that counters the position of DTE's experts that the machinery and equipment are used to inspect, test, and control the quality of the electricity.

We conclude that DTE's machinery and equipment located outside its generation plants are used in the activity of converting and conditioning electricity by changing the quality, form, character, or composition of the electricity for ultimate sale at retail up until the time the electricity reaches its customers' meters, at which point it becomes a finished good. We initially note that, as opposed to the extremely detailed scientific views espoused by DTE's experts, which explain and elaborate on the physics involved and why the electricity continues to be "processed," the one expert relied on by the Department submitted an affidavit that is essentially conclusory in form, cursorily stating that the composition, nature, and character of electricity does

not change during transmission and distribution. "[M]ere conclusory allegations within an affidavit that are devoid of detail are insufficient to create a question of fact." *Hamade v Sunoco, Inc (R&M)*, 271 Mich App 145, 163; 721 NW2d 233 (2006), citing *Quinto v Cross & Peters Co*, 451 Mich 358, 371-372; 547 NW2d 314 (1996). Further, in his deposition, the Department's expert testified:

> *Q.* So at the point where these lines are coming out of generation across the transmission line before it gets to the bulk power station, that — the electricity at that voltage level isn't in a form where it's usable to any customer; is that right? Nobody can tap into 138,000 volt[s]?
>
> *A.* No, most likely not, unless you had some large industrial user . . . .
>
> *Q.* But for the bulk of our customers, they're not going to be able to use that power that's on a high voltage transmission line until it's transformed?
>
> *A. Until it's transformed, yes.* [Emphasis added.]

While the Department's expert generally testified in his deposition in a manner consistent with the Department's position, he struggled at times to do so, e.g., "I guess that would be considered conditioning, yeah, because we want to change that phase angle [relative to voltage and current] to something different."

The terms "form, composition, quality, combination, or character," MCL 205.94o(7)(a), are sufficiently broad and expansive to encompass voltage and current changes in electricity as it travels through the transmission and distribution system. We are in accord with the analysis of the Court of Claims. Additionally, we find it indisputable that electricity is not a finished good ready for sale until it reaches the meters of DTE's customers. The expert testimony and affidavits clearly indicated that electricity is not in usable form for

customers, and is in fact a danger or hazard to customers, until it completes its passage through the transmission and distribution system.

Furthermore, as discussed earlier, the Department has effectively failed to challenge DTE's position under MCL 205.94o(3)(d) that the machinery and equipment in dispute are used to inspect, test, and control the quality of electricity as it flows through the transmission and distribution system. Under MCL 205.94o(3)(d), these functions or activities are defined as constituting industrial processing. And again, we conclude that electricity is not a finished good until it reaches the meters of DTE's customers.[7]

At oral argument, the Department adamantly contended that the case was easily decided under MCL 205.94o(6)(b), which provides that "[i]ndustrial processing does not include . . . distribution . . . activities," given that it is beyond reasonable dispute that the machinery and equipment are used to distribute electricity to customers. DTE argues that MCL 205.94o(6)(b) is only implicated after the activity of industrial processing is completed and a finished good is produced. MCL 205.94o(7)(a), which provides that industrial processing "ends when finished goods first come to rest in finished goods inventory storage," and MCL 205.94o(3)(d), which contains comparable language, can be construed to complement the distribution-activity exclusion in MCL 205.94o(6)(b).

---

[7] We also note that because "electricity" was and is expressly included in the definition of "tangible personal property," MCL 205.92(*l*), as amended by 2000 PA 391, effective January 3, 2001; MCL 205.92(k), as amended by 2004 PA 172, effective September 1, 2004, and because it is "tangible personal property" that must be converted or conditioned, MCL 205.94o(7)(a), it could be argued that it was envisioned that "electricity" might be subject to ongoing and continuing industrial processing.

The Legislature seemingly envisioned a simple manufacturing situation in which a company engages in industrial processing at its plant to produce a product, the product is in the form of a finished good and ready for retail sale while awaiting transport at the company's plant, and then the company ships or distributes the product to a customer. In that situation, where there is a clean line of demarcation between production and distribution, one can more easily and reasonably read MCL 205.94o(3)(d), (6)(b), and (7)(a) *in pari materia, Tyler v Livonia Pub Sch*, 459 Mich 382, 391-392; 590 NW2d 560 (1999), allowing an exemption for equipment in the plant used to produce the product, but disallowing an exemption for any equipment used to distribute the product from the plant to the customer. The case at bar does not present such a simple fact pattern.

In light of our holding earlier in this opinion, we have a situation in which machinery and equipment are concurrently used in a unified system for purposes of both distribution *and* industrial processing. In such a situation, the caselaw is clear that the "industrial processing" exemption applies to the machinery and equipment *in full*. In *Mich Allied Dairy Ass'n v State Bd of Tax Admin*, 302 Mich 643, 649-651; 5 NW2d 516 (1942), our Supreme Court affirmed the circuit court's allowance of a full exemption with respect to milk bottles and cans that were used for distribution *and* for the industrial processing[8] of milk:

---

[8] The Court explained how the milk bottles and cans were used to keep the milk cool and free from germs, additionally observing:

Milk is not marketable until rendered suitable for purchase and consumption from the point of view of the consumer, for only milk which, after pasteurization, has been cooled and protected against subsequent contamination or deterioration may be used

The question is raised whether the exemption should apply inasmuch as the milk bottles and cans are also used as delivery containers, the latter use not being industrial processing. Without considering the practical disadvantages of using one set of bottles and cans for refrigeration and another for delivery, we believe that the one use of bottles and cans in industrial processing makes them exempt from the general sales and use taxes, *notwithstanding the fact that they are also put to another use not in industrial processing.*

Where an article has more than one use, one or more (but not all) of which are within the agricultural producing or industrial processing exemptions, the legislature could have provided that the portion of the value of the article representing its nonexempt uses should bear the tax, but it has not done so. [Emphasis added.]

"[C]oncurrent taxable use with an exempt use does not remove the protection of exemption." *Mich Milk Producers Ass'n v Dep't of Treasury*, 242 Mich App 486, 495; 618 NW2d 917 (2000). When equipment is used from the outset in industrial processing as well as otherwise, the full exemption is to be allowed, and apportionment is not permitted "when the equipment involved is put to mixed use, but in a unified process." *Mich Bell Tel Co v Dep't of Treasury*, 229 Mich App 200, 211-212; 581 NW2d 770 (1998). Accordingly, DTE is entitled to the claimed "industrial processing" exemption in full, despite the fact that the machinery and equipment in dispute are used, in part, for a nonexempt purpose, i.e., distribution, given that the machinery and

with confidence that it has been rendered safe as regards pathogenic bacteria. [*Id.* at 648-649 (citation and quotation marks omitted).]

By analogy, electricity is not marketable and safe, given the voltage levels, until it reaches a customer's meter. *Mich Allied Dairy* thus provides further support for our holding that DTE uses the machinery and equipment for purposes of industrial processing.

equipment are concurrently being used to also industrially process electricity, all as part of a unified process or system.

Finally, we must address a rule promulgated by the Department, Mich Admin Code, R 205.115(4), which has existed for many years, and which provides:

> The sale of tangible personal property consumed or used in the transmission or distribution of electricity . . . is taxable. Such transmission or distribution starts at the place where the product leaves the immediate premises from which it is manufactured.

Rule 205.115(4) would clearly preclude the exemption sought by DTE. However, "interpretive rules are invalid when they conflict with the governing statute . . . ." *Guardian Indus*, 243 Mich App at 254. Here, R 205.115(4) conflicts with the UTA and the industrial-processing exemption as construed by us today; therefore, the provision is invalid and unenforceable.

### III. CONCLUSION

The machinery and equipment located outside DTE's generation plants, which the Department asserts are subject to use tax, are used to transmit and distribute electricity, but they are also used for industrial processing with respect to the electricity. Therefore, the machinery and equipment are exempt from use tax under MCL 205.94o as found by the Court of Claims. DTE is entitled to the "industrial processing" exemption.

Affirmed. Having fully prevailed on appeal, DTE is awarded taxable costs pursuant to MCR 7.219.

FITZGERALD and BORRELLO, JJ., concurred with MURPHY, C.J.