# STATE OF MICHIGAN

# COURT OF APPEALS

---

TOTAL FOUNDATIONS, LLC,

     Plaintiff-Appellee,

v

DEPARTMENT OF TREASURY,

     Defendant-Appellant.

UNPUBLISHED
March 22, 2016

No. 322983
Court of Claims
LC No. 13-000022-MT

---

Before: GLEICHER, P.J., and MURPHY and OWENS, JJ.

PER CURIAM.

Defendant Department of Treasury (Department) appeals as of right the judgment of the Court of Claims ordering the Department to refund use taxes paid by plaintiff Total Foundations, LLC (TFL), in the amount of $74,950, plus statutory interest. The dispute concerns whether TFL is entitled to the industrial-processing exemption in MCL 205.94*o* for purposes of the Use Tax Act (UTA), MCL 205.91 *et seq*. The court found that TFL was entitled to the exemption and ordered the Department to refund the full amount of its assessment. We affirm in part, reverse in part, and remand for further proceedings.

## I. FACTUAL BACKGROUND

TFL is in the business of installing foundations and earth retention systems. The particular business that is the subject of dispute in this case is TFL's installation of foundations for International Transmission Company (ITC). ITC's business consists of transmitting power from power generation facilities to individual and business consumers of electricity. Expert testimony established that power is generated at facilities owned by entities like DTE Energy at approximately 20,000 volts before going through transformers that step up the voltage to 200,000 to 300,000 volts. The power is then transported from the generating facilities on high transmission towers of up to 200 feet to electrical substations. At a substation, various equipment, such as transformers that are mounted on steel poles, steps down the voltage to approximately 115,000 volts. The electricity is then transmitted through transmission towers to another substation that further reduces the voltage. The process continues until the voltage is reduced to 120 to 240 volts, the level at which it is in a form usable for households and businesses.

-1-

TFL's work involves installing the foundations to which transmission towers and steel poles at substations are attached. TFL begins the process by drilling a hole into the ground, which can vary from 8 feet to 60 feet deep. A rebar cage is then placed into the hole and backfilled with concrete. At some point, an anchor bolt cage is inserted into the hole before it is finished being filled with concrete. Once the foundation is in place, ITC attaches its transmission towers or steel poles used at substations. At the substations, the various transformers and other equipment used to step down the voltage are then attached to the steel poles that are attached to TFL's foundations.

During the period at issue, August 1, 2007, through July 31, 2011, TFL claimed that the materials used to build and install the foundations were exempt from the use tax under the industrial-processing exemption. The Department's audit concluded that TFL was not entitled to the exemption. An informal conference was conducted that upheld the Department's determination, and a final assessment was issued. TFL then initiated this action in the Court of Claims. Following a bench trial, the court concluded that it was bound by this Court's opinion in *Detroit Edison Co v Dep't of Treasury*, 303 Mich App 612, 614; 844 NW2d 198 (2014), aff'd in part, rev'd in part 498 Mich 28 (2015), wherein the panel held that Detroit Edison Company (DTE) was entitled to the UTA's industrial-processing exemption for machinery and equipment located outside of DTE's generation plants. This Court determined that the exemption applied because electricity leaves a generation plant at extremely high and unusable voltage levels and the machinery and equipment outside of a plant are then used "in the activity of converting and conditioning [the] electricity by changing . . . [its] quality, form, character, or composition . . . for ultimate sale at retail up until the time the electricity reaches its customers' meters, at which point it becomes a finished good." *Id.* at 627. The Court of Claims here ruled that the towers and steel poles were necessary pieces of equipment in the industrial processing of electricity and that these towers and poles could not stand without being affixed to the concrete foundations TFL installed. The trial court held that TFL was, therefore, entitled to the industrial-processing exemption and entered judgment in favor of TFL, requiring the Department to refund the use taxes paid pursuant to its final assessment in the amount of $74,950, plus statutory interest. The Department appeals as of right.

## II. STANDARD OF REVIEW

This Court reviews for clear error a trial court's factual findings in a bench trial, whereas the trial court's conclusions of law are reviewed de novo. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). We review de novo issues concerning the construction of the UTA. *Guardian Indus Corp v Dep't of Treasury*, 243 Mich App 244, 248; 621 NW2d 450 (2000).

## III. ANALYSIS

Under the UTA, a six-percent tax is imposed on a consumer's use, storage, and consumption of tangible personal property. *Detroit Edison Co v Dep't of Treasury*, 498 Mich 28, 35; 869 NW2d 810 (2015). The UTA's industrial-processing exemption provides, in pertinent part, as follows:

(1) The tax levied under this act does not apply to property sold to the following after March 30, 1999, subject to subsection (2):

\* \* \*

(b) A person, whether or not the person is an industrial processor, if the tangible personal property is intended for ultimate use in and is used in industrial processing by an industrial processor. [MCL 205.94*o*(1)(b).]

MCL 205.94*o*(7)(a) defines "industrial processing" as

the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail use or for use in the manufacturing of a product to be ultimately sold at retail or affixed to and made a structural part of real estate located in another state. Industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage.

In *Detroit Edison*, 498 Mich at 40-42, our Supreme Court, in affirming that part of this Court's ruling that DTE was entitled to an industrial-processing exemption, held:

We conclude that altering the voltage conditions the electricity for ultimate sale at retail. The industrial processing exemption inquires whether tangible personal property constitutes a finished good. The parties' various experts agree that the voltage levels at which the electricity is initially generated are not in their final form, such that they would be appropriate for ordinary use by the consumer. Thus, altering the voltage conditions the electricity for ultimate sale at retail because the electricity is not finished and, therefore, not suitable for consumption until that voltage has been lowered.

Furthermore, altering the voltage transforms the quality and character of the electricity. The parties' experts agree that the tangible personal property generated by plaintiff—whether it is characterized as electricity or electric power—is composed of both voltage and current. Put simply, electricity is measured, at least in part, by voltage. Because electricity is measured in this way, voltage is an essential attribute, and an inherent feature, of electricity. Altering the voltage therefore alters the quality and character of the electricity. Accordingly, altering the voltage constitutes an industrial-processing activity by satisfying the initial sentence of MCL 205.94*o*(7)(a).

The next inquiry required under MCL 205.94*o*(7)(a) is whether the industrial processing of the electricity outside the generation plant satisfies the second sentence, which provides that industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods

inventory storage. Defendant does not dispute that industrial processing begins before the electricity has been transmitted from the generation plant. And defendant has identified no point at which the electricity comes to rest in inventory storage. And nowhere does the record otherwise suggest that electricity ever comes to rest in inventory storage. Moreover, electricity is never a finished good until the voltage has been reduced to a level approximating 120/240 volts for the typical residential consumer and 480 volts for the typical industrial consumer. We conclude as a result that industrial processing of electricity does not become complete until final distribution to the consumer because there is simply no point within the electric system at which finished goods first come to rest in finished goods inventory storage before that point.

For these reasons, the industrial processing of electricity under MCL 205.94o(7)(a) occurs throughout the electric system from its initial generation until its final distribution to the consumer. [Citations, quotation marks, alteration brackets, and emphasis omitted.]

The machinery and equipment, or tangible personal property, at issue in *Detroit Edison* included transformers, fuses, circuit breakers, cables, and poles, all as employed to impact or monitor the voltage levels in order to ensure consumer receipt of a usable product. *Detroit Edison*, 498 Mich at 33. Here, the tangible personal property at issue is the raw materials used to build the foundations to which the steel poles and towers are attached or mounted.

Clearly, ITC qualified as an industrial processor under the UTA and the Supreme Court's construction of the UTA in *Detroit Edison*, and the Department does not appear to dispute that matter. It is also clear, for the same reasons and apparently absent dispute, that ITC was generally engaged in industrial processing. And in order for TFL, which itself was not an industrial processor, to be entitled to the industrial-processing exemption, it was necessary to show that the foundation materials or foundations constituted tangible personal property used in industrial processing by industrial-processor ITC. MCL 205.94o(1)(b) (use tax does not apply to "[a] person, whether or not the person is an industrial processor, if the tangible personal property is intended for ultimate use in and is used in industrial processing by an industrial processor"). Under the reasoning in *Detroit Edison*, TFL's foundations that held in place electrical poles and towers were intended for use and actually used in industrial processing conducted by ITC. The dispute that arose concerns two subsections of MCL 205.94o that were not directly addressed in *Detroit Edison* and that effectively reflect a distinction between exempt tangible personal property and nonexempt real property.

MCL 205.94o(4)(b) provides that "[p]roperty that is eligible for an industrial processing exemption includes . . . [m]achinery, equipment, tools, dies, patterns, *foundations for machinery or equipment*, or other processing equipment used in an industrial processing activity and in their repair and maintenance." (Emphasis added.) This language plainly encompasses TFL's foundations upon which ITC mounts its equipment. However, MCL 205.94o(5)(a) provides that "[t]angible personal property permanently affixed and becoming a structural part of real estate in this state" is not eligible for the industrial-processing exemption. This language suggests that foundation materials and completed foundations are not exempt. The Court of Claims determined that because MCL 205.94o(4)(b) more specifically describes TFL's foundations, its

-4-

inclusive language took precedence over the broader general language in MCL 205.94*o*(5)(a). On appeal, the Department argues that the Supreme Court's decision in *Detroit Edison* renders the "general/specific" canon of statutory construction inapplicable. The Department contends that this Court should instead interpret the apparent statutory conflict in its favor due to the principle that tax exemptions are to be construed strictly against the taxpayer. See *Sandy Pines Wilderness Trails, Inc v Salem Twp*, 232 Mich App 1, 13; 591 NW2d 658 (1998).

Where a statute contains a specific provision as well as a related but more general provision, the specific provision governs. *Detroit Edison*, 498 Mich at 43-44. The Supreme Court in *Detroit Edison* determined that this principle of construction did not apply when addressing the Department's argument that DTE's equipment was used to *distribute* electricity, thereby falling under an exception to industrial processing for distribution activities, MCL 205.94*o*(6)(b), which is a more specific provision than the general industrial-processing provision. *Id.* at 43-45. The *Detroit Edison* Court explained why it rejected application of the "general/specific" rule of construction:

> [T]he rule only applies when there is some statutory tension or conflict between two possible treatments of a subject, e.g., when an agricultural statute sets different tax rates for "fruits" and "apples." There is no such conflict or tension here. Rather, there are subjects or activities ("industrial processing") that fall within the category of "industrial processing," and there are other subjects or activities ("distribution" and "shipping") that do not fall within the category of "industrial processing." These categories are separate and distinct, and there is nothing to suggest that one category can be viewed as being more "general" or "specific" than the other. In short, the nonexempt activities in MCL 205.94*o*(6)(b) are in no way within the scope of MCL 205.94*o*(7)(a), and the exempt activity in MCL 205.94*o*(7)(a) is in no way within the scope of MCL 205.94*o*(6)(b). [*Detroit Edison*, 498 Mich at 44-45.]

Although it is a bit difficult to distinguish *Detroit Edison*, we conclude that with respect to a foundation for equipment there is indeed irreconcilable statutory tension or conflict between MCL 205.94*o*(4)(b) and MCL 205.94*o*(5)(a) comparable to the "fruits" and "apples" example in *Detroit Edison*. MCL 205.94*o*(5)(a) is plainly intended to preclude an industrial-processing exemption for real property or tangible personal property that has come to obtain the characteristics or features of real property, like fixtures. And a foundation has attributes typical of real property and not tangible personal property, with foundation materials – at one time being tangible personal property – effectively becoming part of the real estate on formation of a foundation. That said, the Legislature expressly chose to allow for an exemption in regard to foundations for equipment, MCL 205.94*o*(4)(b), essentially treating a foundation, when used in connection with equipment, as tangible personal property. The more specific provision is MCL 205.94*o*(4)(b), given that it particularly covers "foundations for . . . equipment," while MCL 205.94*o*(5)(a) concerns real estate and real estate fixtures in general. The Department's proffered interpretation would render entirely nugatory or meaningless the foundation language in MCL 205.94*o*(4)(b). Accordingly, the industrial-processing exemption applies. However, the *distribution* of electricity, which plainly is being accomplished through ITC's operation along with industrial processing, as assisted by TFL's foundation work, dictates a remand under *Detroit Edison* for an allocation as between the property's use to distribute electricity

(nonexempt use) and its use for industrial processing (exempt use), so as to determine the percentage of exempt use to total use in setting the extent of the exemption/tax.

MCL 205.94*o*(2) provides that property "is exempt only to the extent that the property is used for the exempt purpose stated in this section[,] [with] [t]he exemption . . . [being] limited to the percentage of exempt use to total use [as] determined by a reasonable formula or method approved by the department." The *Detroit Edison* Court observed:

> To determine the "percentage of exempt use to total use," MCL 205.94*o*(2), it is necessary to ascertain both the use of the property for exempt activity and the sum of the uses of the property for exempt and nonexempt activities. Then, the "percentage of exempt use to total use" must be determined on the basis of "a reasonable formula or method approved by the department." MCL 205.94*o*(2). Once this percentage has been identified, the industrial-processing exemption "is limited to" this percentage.
>
> In the case at hand, the record shows that the "exempt use" of the electric system includes, at a minimum, alteration of the voltage under MCL 205.94*o*(7)(a). And "total use" of the electric system is the sum of the uses for such exempt activity plus the nonexempt "distribution" and "shipping" activities under MCL 205.94*o*(6)(b). [Citation omitted.]

Accordingly, we reverse the Court of Claims to the extent that it applied the industrial-processing exemption absent the allocation required by MCL 205.94*o*(2) when it awarded TFL a full refund of the use taxes paid. We remand for proceedings consistent with the directives set forth by our Supreme Court in *Detroit Edison.*

Affirmed in part, reversed in part, and remanded to the Court of Claims for further proceedings consistent with this opinion. We do not retain jurisdiction. Neither party having fully prevailed on appeal, we decline to award taxable costs under MCR 7.219.

/s/ Elizabeth L. Gleicher
/s/ William B. Murphy
/s/ Donald S. Owens