# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

DETROIT EDISON COMPANY v DEPARTMENT OF TREASURY

Docket No. 148753. Argued April 7, 2015 (Calendar No. 1). Decided July 22, 2015.

The Detroit Edison Company brought an action in the Court of Claims against the Department of Treasury, seeking, in part, a refund of use taxes paid under protest for the tax period January 1, 2003, through September 30, 2006. Plaintiff alleged that certain property that had been subjected to the tax was exempt from the tax under the industrial-processing exemption of the Use Tax Act, MCL 205.94o, because the property, located outside plaintiff's generation plants, was used to continue the processing of the electricity. Specifically, plaintiff initially generates electricity at approximately 15,000 to 25,000 volts. To transmit the electricity through the electric system, plaintiff ups the voltage to 115,000 to 500,000 volts. Plaintiff then uses property, such as transformers, to lower the voltage as the electricity nears the consumer. Plaintiff uses other property to monitor the voltage levels across the system. The Court of Claims, Paula J. M. Manderfield, J., granted summary disposition in favor of plaintiff. Defendant appealed. The Court of Appeals, MURPHY, C.J., and FITZGERALD and BORRELLO, JJ., affirmed. 303 Mich App 612 (2014). Defendant sought leave to appeal, and the Supreme Court granted the application. 497 Mich 873 (2014).

In an opinion by Justice MARKMAN, joined by Chief Justice YOUNG and Justices VIVIANO and BERNSTEIN, the Supreme Court *held*:

Under the industrial-processing exemption, when property is simultaneously used for exempt industrial-processing activity and nonexempt shipping and distribution activities, the taxpayer is entitled to an industrial-processing exemption based on the percentage of exempt use to total use as determined by a reasonable formula or method approved by the Department of Treasury.

1. The Use Tax Act imposes a 6% tax on a consumer's use, storage, and consumption of all tangible personal property in Michigan. But under the industrial-processing exemption, MCL 205.94o, the tax does not apply to property sold to an industrial processor for use or consumption in industrial processing. MCL 205.94o(7)(b) defines "industrial processor" as a person who performs the activity of converting or conditioning tangible personal property for ultimate sale at retail or use in the manufacturing of a product to be ultimately sold at retail. Plaintiff is an industrial processor because it generates electricity by converting tangible personal property for ultimate sale at retail. MCL 205.94o(7)(a) defines "industrial processing" as the

activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail. Industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage. Under MCL 205.92 of the Use Tax Act, electricity is tangible personal property. Altering the voltage of the electricity conditions the electricity for ultimate sale at retail because the voltage level at which the electricity is initially generated is not appropriate for ordinary use by a consumer. Altering the voltage also transforms the quality or character of the electricity because voltage is an essential attribute of electricity. Therefore, altering the voltage is an industrial-processing activity. Industrial processing of electricity does not become complete until final distribution to the consumer because there is no previous point at which the finished goods come to rest in finished goods inventory storage. The Court of Appeals correctly concluded that the electric system is used for exempt industrial-processing activity.

2. MCL 205.94o(6)(b) excludes from the definition of "industrial processing" sales, distribution, warehousing, shipping, and advertising activities. The flow of electricity to substations and consumers constitutes distribution and shipping of the electricity. Accordingly, from the time electricity leaves the generation plant until it is distributed to the consumer, the electric system is simultaneously involved in industrial-processing activity under MCL 205.94o(7)(a) and distribution and shipping activities under MCL 205.94o(6)(b). Therefore, the Court of Appeals also correctly determined that the electric system is simultaneously used for both exempt and nonexempt activities.

3. The Court of Appeals erred to the extent it concluded that plaintiff was entitled to the industrial-processing exemption for the entire electric system. Under MCL 205.94o(2), the property used in industrial processing is exempt only to the extent that it is used for industrial processing, and the exemption is limited to the percentage of exempt use to total use determined by a reasonable formula or method approved by the Department of Treasury. To determine the percentage of exempt use to total use, it is necessary to ascertain both the use of the property for exempt activity and the sum of the uses of the property for exempt and nonexempt activities. In this case, the record showed that the exempt use of the electric system included, at a minimum, alteration of the voltage. Total use of the electric system was the sum of the uses for exempt activity plus the nonexempt distribution and shipping activities.

4. Mich Admin Code, R 205.115(4) states that the sale of tangible personal property consumed or used in the transmission or distribution of electricity is taxable. But agencies cannot exercise legislative power by creating law or changing the laws enacted by the Legislature. The Court of Appeals correctly held that the rule, therefore, is invalid to the extent it conflicts with MCL 205.94o.

Affirmed in part, reversed in part, and remanded to the Court of Claims for defendant to approve a reasonable formula or method for determining the percentage of exempt use to total use of the property.

Justice KELLY, joined by Justices ZAHRA and MCCORMACK, dissenting, would have held that industrial processing ends once the electricity leaves the power plant, and would have reversed the judgment of the Court of Appeals to the extent it held that plaintiff was entitled to the industrial-processing exemption for property used outside its plants. Electricity that has left plaintiff's plants does not undergo further changes in form, composition, quality, combination, or character. While the voltage is reduced, for efficiency, during the distribution process, the fundamental nature of the electricity—the flow of electrons—never changes. Producing electricity at a high voltage simply allows plaintiff to supply its product more efficiently across further distances. Because both shipping and distribution are excluded from the definition of industrial processing, activity occurring after the production of a good is not part of the industrial processing of that good. The equipment used by plaintiff to convey electricity to its customers does not qualify for the industrial-processing exemption. Electricity is a vendible good as soon as it leaves the plant. Because plaintiff only engages in shipping and distributing electricity once the electricity leaves its production facilities, it does not use any property in industrial processing outside its production facilities under the industrial-processing exemption. Therefore, all equipment used in transmitting and distributing electric power outside its generating plants is subject to the use tax, and apportionment is not appropriate in this instance.

©2015 State of Michigan

# OPINION

Chief Justice:          Justices:
Robert P. Young, Jr.    Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano
                        Richard H. Bernstein

FILED July 22, 2015

STATE OF MICHIGAN

SUPREME COURT

DETROIT EDISON COMPANY,

Plaintiff-Appellee,

v                                              No. 148753

DEPARTMENT OF TREASURY,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

The Use Tax Act (UTA), MCL 205.91 *et seq*., imposes a 6% tax "for the privilege of using, storing, or consuming tangible personal property in this state . . . ." MCL 205.93(1). However, the UTA exempts from the use tax property sold to "[a]n industrial processor for use or consumption in industrial processing." MCL 205.94o(1)(a). At issue here is whether and to what extent, if any, an electric utility is entitled to the industrial-processing exemption for tangible personal property located

outside its generation plants. The Court of Appeals held that plaintiff was entitled to the full industrial-processing exemption for the property.

We hold that the property here is simultaneously used for exempt "industrial processing" activity under MCL 205.94o(7)(a) and nonexempt "distribution" and "shipping" activities under MCL 205.94o(6)(b). In these circumstances, the taxpayer is entitled to the industrial-processing exemption based on the "percentage of exempt use to total use determined by a reasonable formula or method approved by the department [of Treasury]." MCL 205.94o(2). Accordingly, we affirm the judgment of the Court of Appeals in part, reverse in part, and remand to the Court of Claims for further proceedings.

## I. FACTS AND HISTORY

Plaintiff, Detroit Edison Company (DTE), is an electric utility that is responsible for generating, transmitting, and distributing electricity to residential, commercial, and industrial consumers. The electricity is initially generated at approximately 15,000 to 25,000 volts within each of plaintiff's generation plants. However, to transmit electricity throughout the electric system, plaintiff must then "step up" the voltage to between 115,000 and 500,000 volts as the electricity is transmitted from the generation plant to substations from which the electricity is then distributed to consumers.

Electricity is not usable at the high voltage levels at which it exists when it is initially generated and as it moves throughout the electric system. For instance, most

2

residential consumers use electricity at the 120/240 volt[1] level. For this reason, the electric system employs tangible personal property, such as transformers, at the substations to "step down" the voltage as the electricity nears the consumer. In addition to transformers, the electric system employs a variety of other tangible personal property, including fuses, circuit breakers, cables, and poles, to monitor the voltage levels and ensure that the consumer receives a useable product.

Defendant conducted a use-tax audit for the period between January 1, 2003, and September 30, 2006, and determined that plaintiff had a deficiency because it had claimed the industrial-processing exemption from the use tax for tangible personal property located outside its generation plants.[2] Accordingly, defendant issued a notice of intent to assess in the amount of $11,020,506 in tax plus interest-- an amount that was subsequently corrected upward to $14,046,249 plus interest. Ultimately, defendant issued a final assessment in the amount of $13,102,133.54 plus interest. Plaintiff paid the deficiency under protest and filed suit in the Court of Claims, seeking a refund for the use tax and interest paid under protest, as well as statutory costs, interest, and attorney fees.[3]

---

[1] For the typical home, the 240-volt level is obtained across two 120-volt lines.

[2] There is no dispute that plaintiff may claim the industrial-processing exemption from the use tax for tangible personal property that is used or consumed in industrial processing *within* its generation plants. This case pertains only to whether plaintiff is also entitled to the exemption for tangible personal property located *outside* its plants. For clarity, we refer to this property as the "electric system" throughout this opinion.

[3] Plaintiff also sought a refund of use tax and interest allegedly paid on certain computer-related services. The Court of Claims ruled that plaintiff was not entitled to a refund in this regard and the propriety of that ruling is not before this Court.

The parties filed competing motions for summary disposition under MCR 2.116(C)(10). The Court of Claims eventually granted summary disposition in favor of plaintiff, reasoning that it was clear "that electricity is continuing to be processed up until the point at which it reaches the customer's meter, because the voltage and current levels are drastically changed multiple times at set points, the last being at or near the customer's meter . . . ."

Defendant appealed, and the Court of Appeals affirmed. *Detroit Edison Co v Treasury Dep't*, 303 Mich App 612; 844 NW2d 198 (2014). The Court of Appeals held that the "machinery and equipment are concurrently used in a unified system for purposes of both distribution *and* industrial processing. In such a situation, the caselaw is clear that the 'industrial processing' exemption applies to the machinery and equipment *in full*." *Id*. at 630. We granted defendant's application for leave to appeal in this Court. *Detroit Edison Co v Treasury Dep't*, 497 Mich 873 (2014). Oral arguments were heard on April 7, 2015.

## II. STANDARD OF REVIEW

"A trial court's ruling on a motion for summary disposition is a question of law, which this Court reviews de novo." *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 317; 783 NW2d 695 (2010). Questions of statutory interpretation are also reviewed de novo. *Klooster v Charlevoix*, 488 Mich 289, 295; 795 NW2d 578 (2011).

4

## III. ANALYSIS

## A. USE TAX AND EXEMPTION

The UTA "imposes a 6% tax on a consumer's use, storage, and consumption of all tangible personal property in Michigan." *Andrie Inc v Treasury Dep't*, 496 Mich 161, 164; 853 NW2d 310 (2014). At the time relevant to this case, MCL 205.93(1) of the UTA provided in pertinent part:

> There is levied upon and there shall be collected from every person in this state a specific tax for the privilege of using, storing, or consuming tangible personal property in this state at a rate equal to 6% of the price of the property or services . . . . [As amended by 2002 PA 511.]

The UTA industrial-processing statute, MCL 205.94o, provided in pertinent part:

> (1) The tax levied under this act does not apply to property sold to the following after March 30, 1999, subject to subsection (2):
>
> (a) An industrial processor for use or consumption in industrial processing.
>
> (b) A person, whether or not the person is an industrial processor, if the tangible personal property is intended for ultimate use in and is used in industrial processing by an industrial processor.
>
> (c) A person, whether or not the person is an industrial processor, if the tangible personal property is used by that person to perform an industrial processing activity for or on behalf of an industrial processor.
>
> * * *
>
> (2) The property under subsection (1) is exempt only to the extent that the property is used for the exempt purpose stated in this section. The exemption is limited to the percentage of exempt use to total use determined by a reasonable formula or method approved by the department.
>
> (3) Industrial processing includes the following activities:
>
> * * *

5

(d) Inspection, quality control, or testing to determine whether particular units of materials or products or processes conform to specified parameters at any time before materials or products first come to rest in finished goods inventory storage.

\* \* \*

(j) Production material handling.

(k) Storage of in-process materials.

\* \* \*

(6) Industrial processing does not include the following activities:

\* \* \*

(b) Sales, distribution, warehousing, shipping, or advertising activities.

\* \* \*

(7) As used in this section:

(a) "Industrial processing" means the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail. Industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage.

(b) "Industrial processor" means a person who performs the activity of converting or conditioning tangible personal property for ultimate sale at retail or use in the manufacturing of a product to be ultimately sold at retail. [As enacted by 1999 PA 117.]

"The industrial processing exemption is, in part, the product of a targeted legislative effort to avoid double taxation of the end product offered for retail sale or, in other terms, to avoid 'pyramiding the use and sales tax.' " *Elias Bros Restaurants, Inc v Treasury Dep't*, 452 Mich 144, 152; 549 NW2d 837 (1996), quoting *Int'l Research & Dev Corp v*

6

*Revenue Dep't*, 25 Mich App 8, 13; 181 NW2d 53 (1970). "Pyramiding occurs when both use and sales taxes are imposed on the production and sale of retail goods." *Elias Bros*, 452 Mich at 152. "[T]o determine whether the industrial processing exemption applies, it is necessary to consider the *activity* in which the equipment is engaged and not the *character* of the equipment-owner's business." *Id.* at 157 (emphasis added).

MCL 205.92 of the UTA specifically provides that electricity constitutes "tangible personal property." Effective July 23, 2002, MCL 205.92(*l*) read as follows:

> "Tangible personal property" beginning September 20, 1999, includes electricity, natural or artificial gas, or steam and also the transmission and distribution of electricity used by the consumer or user of the electricity, whether the electricity is purchased from the delivering utility or from another provider. [As amended by 2002 PA 511.]

Effective September 1, 2004, MCL 205.92(k) reads as follows:

> "Tangible personal property" means personal property that can be seen, weighed, measured, felt, or touched or that is in any other manner perceptible to the senses and includes electricity, water, gas, steam, and prewritten computer software. [As amended by 2004 PA 172.]

Accordingly, there is no dispute that electricity constitutes "tangible personal property" for purposes of the industrial-processing exemption.[4] MCL 205.92. In addition, there is no dispute that plaintiff is an "industrial processor" because by generating electricity it "performs the activity of converting or conditioning tangible personal property for ultimate sale at retail . . . ." MCL 205.94o(7)(b). With that in mind, we address whether

---

[4] Electricity is also "tangible personal property" for purposes of MCL 205.93(1). That is, electricity is subject to the use tax because it is deemed "tangible personal property" in MCL 205.92. In this case, we are only concerned with electricity as "tangible personal property" for purposes of the industrial-processing exemption, MCL 205.94o.

7

plaintiff's tangible personal property outside the generation plants is exempt from the use tax under the industrial-processing exemption.

We start with a discussion of "industrial processing" under MCL 205.94o(7)(a) and only then address MCL 205.94o(2) for three reasons. First, the introductory sentence of MCL 205.94o(2) provides that "[t]he property under subsection (1) is exempt only to the extent that the property is used for the exempt purpose stated in this section." Therefore, before addressing the second sentence of MCL 205.94o(2), it is initially necessary to assess whether and to what extent the property is used for the "exempt purpose," i.e., industrial processing. This is the threshold inquiry required by the first sentence of MCL 205.94o(2), and MCL 205.94o(7)(a) defines "industrial processing."

Second, the next sentence of MCL 205.94o(2) provides that "[t]he exemption is limited to the percentage of exempt use to total use determined by a reasonable formula or method approved by the department." Thus, similarly to the introductory sentence of MCL 205.94o(2), the second sentence requires an initial assessment of whether and to what extent property is put to the "exempt use" of industrial processing.

Third, the overall concern of the industrial-processing exemption, MCL 205.94o, is, of course, industrial processing. It is only logical, therefore, to first determine whether "industrial processing" has occurred. Because "industrial processing" is defined by MCL 205.94o(7)(a), the analysis begins there. If "industrial processing" activity is not occurring under either MCL 205.94o(7)(a) or MCL 205.94o(3), the latter of which specifically enumerates certain activities that constitute "industrial processing," the analysis is complete and the taxpayer is entitled to no exemption. On the other hand, if "industrial processing" activity is occurring, it is then necessary to analyze the remaining

8

provisions of MCL 205.94o, including but not limited to subsection (2), to determine the measure of the exemption.

## B. INDUSTRIAL PROCESSING

The initial consideration is whether altering the voltage of the electricity after it is transmitted by the generation plant satisfies the definition of "industrial processing" under MCL 205.94o(7)(a). Again, this provision states in pertinent part:

> "Industrial processing" means the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail . . . . Industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage. [MCL 205.94o(7)(a).]

The first inquiry under MCL 205.94o(7)(a) is whether altering the voltage satisfies the first sentence, *to wit*, whether altering the voltage constitutes "converting or conditioning [electricity] by changing the form, composition, quality, combination, or character . . . for ultimate sale at retail." Because these words are undefined by statute, it is appropriate to consult a dictionary. *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156; 802 NW2d 281 (2011) ("We may consult dictionary definitions to give words their common and ordinary meaning."). "Condition" means "to put in a fit or proper state." *Random House Webster's College Dictionary* (1997). "Quality" means "an essential characteristic, property, or attribute." *Id*. "Character" means "the aggregate of features and traits that form the individual nature of a person or thing." *Id*.

We conclude that altering the voltage "condition[s]" the electricity "for ultimate sale at retail." MCL 205.94o(7)(a). The industrial processing exemption inquires

9

whether tangible personal property constitutes a "finished good."  MCL 205.94o(7)(a).

The parties' various experts agree that the voltage levels at which the electricity is initially generated are not in their final form, such that they would be appropriate for ordinary use by the consumer.[5]  Thus, altering the voltage "conditions" the electricity for ultimate sale at retail because the electricity is not "finished" and, therefore, not suitable for consumption until that voltage has been lowered.

Furthermore, altering the voltage transforms the "quality" and "character" of the electricity.  The parties' experts agree that the tangible personal property generated by plaintiff-- whether it is characterized as "electricity" or "electric power"-- is composed of both voltage and current.  Put simply, electricity is measured, at least in part, by voltage. Because electricity is measured in this way, voltage is an essential attribute, and an inherent feature, of electricity.  Altering the voltage therefore alters the "quality" and "character" of the electricity.  Accordingly, altering the voltage constitutes an industrial-processing activity by satisfying the initial sentence of MCL 205.94o(7)(a).

The next inquiry required under MCL 205.94o(7)(a) is whether the industrial processing of the electricity outside the generation plant satisfies the second sentence, which provides that "[i]ndustrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage."  Defendant

---

[5] The dissent concedes this fact as well.  *Post* at 5 ("The Court of Appeals erred when it overemphasized DTE's claim that the electricity is not in its final, safe form until it reaches customers.").

does not dispute that industrial processing begins before the electricity has been transmitted from the generation plant. And defendant has identified no point at which the electricity comes to rest in inventory storage. And nowhere does the record otherwise suggest that electricity ever comes to rest in inventory storage. Moreover, electricity is never a "finished good" until the voltage has been reduced to a level approximating 120/240 volts for the typical residential consumer and 480 volts for the typical industrial consumer. We conclude as a result that industrial processing of electricity does not become complete until final distribution to the *consumer* because there is simply no point within the electric system at which "finished goods first come to rest in finished goods inventory storage" before that point.[6]

For these reasons, the industrial processing of electricity under MCL 205.94o(7)(a) occurs throughout the electric system from its initial generation until its final distribution to the consumer.[7] We therefore affirm the Court of Appeals' conclusion that the electric system is used for exempt "industrial processing" activity.

---

[6] To be clear, we conclude from the record before us that "industrial processing" is complete when the electricity is finally delivered to the consumer *at the meter* because at this point, the consumer has received a "finished good." Indeed, we note that plaintiff specifically argues that the "finished good" is "delivered once electricity *reaches the customer's meter* in a form usable by the customer." (Emphasis added.) We do not intend to suggest that further modification of this "finished good" by the consumer for the consumer's unique needs constitutes additional "industrial processing" activity.

[7] We do not suggest that alteration of the voltage is the *only* "industrial processing" that may occur within the electric system. For example, the record here suggests that some equipment is being used to monitor voltage levels. The use of this equipment for monitoring might be considered "industrial processing" under MCL 205.94o(3)(d), which provides that "industrial processing" includes "[i]nspection, quality control, or testing . . . ."

11

## C. DISTRIBUTION AND SHIPPING

The second consideration is whether the equipment is somehow *excluded* from the industrial-processing exemption by MCL 205.94o(6)(b), which reads:

> (6) Industrial processing does not include the following activities:
>
> \* \* \*
>
> (b) Sales, distribution, warehousing, shipping, or advertising activities.

"Distribution" describes "an act or instance of distributing," *Random House Webster's College Dictionary* (1997), and "shipping" describes "the act or business of a person or thing that ships goods." *Id.* The electric system moves electricity from each substation, either to other substations, or to the consumer. This movement, or flow, of electricity constitutes "distribution" and "shipping" of the electricity from the generation plant to the consumer. Thus, the electric system is involved in "distribution" and "shipping" activities, and industrial processing "does not include" these activities. MCL 205.94o(6)(b). Accordingly, from the time when electricity leaves the generation plant until it is finally distributed to the consumer, the electric system is *simultaneously* involved in "industrial processing activity" under MCL 205.94o(7)(a) and "distribution" and "shipping" activities under MCL 205.94o(6)(b). We therefore also affirm the Court of Appeals' conclusion that the electric system is simultaneously used for exempt and nonexempt activities.

Defendant argues that when "an activity is 'industrial processing' under [MCL 205.94o(7)(a)], but when a specified 'exclusion' applies, it will take the activity outside of the exemption." That is, defendant argues, distribution and shipping are

12

"specific modifier[s]" to the general definition of industrial processing. See *In re Haley*, 476 Mich 180, 198; 720 NW2d 246 (2006) ("[I]t is a settled rule of statutory construction that where a statute contains a specific statutory provision and a related, but more general, provision, the specific one controls."). See also *Ter Beek v City of Wyoming*, 495 Mich 1, 22; 846 NW2d 531 (2014) ("It is well accepted that when two legislative enactments seemingly conflict, the specific provision prevails over the more general provision."). We respectfully disagree with defendant's analysis.

The "general/specific" rule of statutory interpretation, although a longstanding and honorable interpretative canon, is utterly inapplicable in this case. It is a rule that applies only in circumstances in which some subject in dispute has been removed, or carved out from, a general category of treatment, to which it would *otherwise* belong, and placed within a more narrow category of treatment to which it belongs by specific definition, *to wit*, in those circumstances in which the statutory issue is presented in the following form: should the subject in dispute be treated in accordance with the general category to which it belongs or in accordance with the more specific category to which it also belongs? See *In re Landaal*, 273 Mich 248, 252; 262 NW2d 897 (1935), quoting *Crane v Reeder*, 22 Mich 322, 334 (1871):

> [W]here there are two acts or provisions, one of which is special and particular, and certainly includes the matter in question, and the other general, which, if standing alone, would include the same matter and thus conflict with the special act or provision, the special must be taken as intended to constitute an exception to the general act or provision . . . . [Quotation marks omitted.]

That is, the rule only applies when there is some statutory tension or conflict between two possible treatments of a subject, e.g., when an agricultural statute sets different tax rates

13

for "fruits" and "apples." There is no such conflict or tension here. Rather, there are subjects or activities ("industrial processing") that fall within the category of "industrial processing," and there are other subjects or activities ("distribution" and "shipping") that do not fall within the category of "industrial processing." These categories are separate and distinct, and there is nothing to suggest that one category can be viewed as being more "general" or "specific" than the other. In short, the nonexempt activities in MCL 205.94o(6)(b) are in no way within the scope of MCL 205.94o(7)(a), and the exempt activity in MCL 205.94o(7)(a) is in no way within the scope of MCL 205.94o(6)(b). Accordingly, there is no hierarchy among tax categories, no conflict or tension as to the treatment of any specific activity, and, for the reasons set forth later in Part III(E) of this opinion, no "all or nothing" conferral of the tax exemption.

## D. RULE 65

Defendant also argues that plaintiff is not entitled to the industrial-processing exemption by operation of Mich Admin Code, R 205.115(4)-- known as Rule 65(4) of the Specific Sales and Use Tax Rules promulgated by defendant. The rule was enacted under MCL 24.207 of the Administrative Procedures Act[8] with the force of law. See *Danse Corp v Madison Heights*, 466 Mich 175, 181; 644 NW2d 721 (2002) ("In order for an agency regulation . . . of general applicability to have the force of law, it must fall under the definition of a properly promulgated rule."). Rule 65(4) reads as follows:

---

[8] MCL 24.201 *et seq*.

14

The sale of tangible personal property consumed or used in the transmission or distribution of electricity, gas, or steam is taxable. Such transmission or distribution starts at the place where the product leaves the immediate premises from which it is manufactured.

Under Rule 65(4), the use tax may be applied to the electric system because the electric system is "tangible personal property . . . used in the transmission or distribution of electricity . . . ."[9] Nonetheless, and despite the fact that Rule 65(4) is a "properly promulgated rule," it does not control the outcome of this case.

"Perhaps the most fundamental aspect of the 'legislative power' . . . is the power to tax and to appropriate for specified purposes." *46th Circuit Trial Court v Crawford Co*, 476 Mich 131, 141; 719 NW2d 553 (2006). "[A]gencies cannot exercise legislative power by creating law or changing the laws enacted by the Legislature." *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 98; 754 NW2d 259 (2008). Therefore, when the Legislature has exempted certain tangible personal property from the use tax by enacting MCL 205.94o, defendant cannot impose the use tax on that property through the rulemaking process. See *R C Mahon Co v Dep't of Revenue*, 306 Mich 660, 666; 11 NW2d 280 (1943) ("[L]iability for payment of the sales (and use) tax is controlled by statute. It cannot be imposed by rulings or regulations of the board (department).") (citation and quotation marks omitted). As explained in Part III(C) of this opinion, we

---

[9] We note that Rule 65(4) simply provides that the electric system "is taxable." It does not provide that the electric system is *entirely* taxable. That is, the rule does not provide that the electric system is *completely* excluded from the industrial-processing exemption, as defendant contends. In any event, we need not address whether Rule 65(4) establishes that the electric system is completely excluded from the industrial-processing exemption because, as explained later in this opinion, MCL 205.94o would control in any event over Rule 65(4) to the extent the rule altogether precluded the exemption.

15

conclude that plaintiff is entitled to the industrial-processing exemption for the electric system under MCL 205.94o-- at least in *part*-- because exempt industrial-processing activity and nonexempt activities are occurring simultaneously. MCL 205.94o(2) contemplates that in such a situation the taxpayer is entitled to *some* measure of an exemption. Rule 65(4), on the other hand, may be read to provide that the electric system is entirely taxable. Accordingly, Rule 65(4) directly conflicts with MCL 205.94o to the extent that the rule can be read to deprive electric utilities, such as plaintiff, of the entirety of the industrial-processing exemption for tangible personal property located outside the generation plants. Because defendant cannot through the rulemaking process "chang[e] the laws enacted by the Legislature," *In re Complaint of Rovas*, 482 Mich at 98, MCL 205.94o is controlling and Rule 65(4) is invalid to the extent it is in conflict with MCL 205.94o. We again affirm the Court of Appeals' conclusion in this regard.

## E. APPORTIONMENT

To reiterate, the electric system is used for tax-exempt activity under MCL 205.94o(7)(a), as well as for nonexempt activities under MCL 205.94o(6)(b). Furthermore, Rule 65(4) does not govern the outcome of this case. The next consideration is whether, and to what extent, the tax on the electric system may be apportioned between exempt and nonexempt activities under MCL 205.94o(2).[10]

---

[10] For simplicity, we refer to MCL 205.94o(2) as an apportionment provision because it describes how to apply the exemption. The exemption applies to property "used for the exempt purpose" and, by implication, does not apply to property *not* "used for the exempt purpose." The exemption must, therefore, be "apportioned" on the basis of the use of the property.

16

Once again, MCL 205.94o(2) reads:

> The property under subsection (1) is exempt only to the extent that the property is used for the exempt purpose stated in this section. The exemption is limited to the percentage of exempt use to total use determined by a reasonable formula or method approved by the department.

The electric system is used for "the exempt purpose stated in this section"-- industrial processing-- until that point at which the electricity is finally distributed to the consumer. This is because MCL 205.94o(7)(a) provides that "[i]ndustrial processing. . . ends when finished goods first come to rest in finished goods inventory storage," and as already observed, electricity never comes to rest in finished goods inventory storage; rather, it continues to be processed until final delivery is made to the consumer. Industrial processing therefore occurs throughout the electric system[11] under MCL 205.94o(7)(a).[12] Furthermore, as already explained, nonexempt "distribution" and "shipping" activities under MCL 205.94o(6)(b) also occur throughout the electric system until final delivery is made to the consumer. Accordingly, because the electric system is simultaneously used for both exempt and nonexempt activities, it is necessary to consider MCL 205.94o(2).

MCL 205.94o(2) provides in relevant part that "[t]he property under subsection (1) is exempt only to the extent that the property is used for the exempt purpose stated in this section." The electric system satisfies MCL 205.94o(1) because plaintiff is an "industrial

---

[11] See note 6 of this opinion.

[12] We again note that "industrial processing" may occur under other circumstances as well, e.g., MCL 205.94o(3)(d) (noting that industrial processing includes "[i]nspection, quality control, or testing").

processor" and, as explained previously, the electric system is used for "industrial processing." See MCL 205.94o(1)(a) (stating that the tax levied under the UTA does not apply to property sold to "[a]n industrial processor for use or consumption in industrial processing"). Moreover, the only conceivable "exempt purpose" of MCL 205.94o is industrial processing, and as a result, the electric system is exempt from the use tax "only to the extent that [it] is used for" industrial processing.

To identify the extent to which the electric system is used for industrial processing, MCL 205.94o(2) further provides that the exemption "is limited to the percentage of exempt use to total use . . . ." The term "exempt use" refers to use of the property for industrial-processing activity because industrial-processing activity is the *only* exempt activity identified in MCL 205.94o.[13] Therefore, "total use" must refer to the aggregate use of the property for exempt activity and all other activities. That is, "total use" is the sum of the property's uses for all exempt and nonexempt activities. Whether those two types of activities happen to occur simultaneously is irrelevant to the statutory apportionment scheme. And as a simple matter of mathematics, "total use"-- the sum of *all* uses-- must equal 100%. We therefore reverse the Court of Appeals to the

---

[13] "Industrial processing" activity is generally defined by MCL 205.94o(7)(a). However, the statute also provides that certain specific activities that do not satisfy the general MCL 205.94o(7)(a) definition nonetheless constitute "industrial processing" activity for purposes of the statute. See, e.g., MCL 205.94o(3)(h) (stating that industrial processing includes "[p]rocessing of production scrap and waste up to the point it is stored for removal from the plant of origin"). Still, only property used for a single activity is exempt from the use tax: property used for industrial processing.

extent that it concluded that plaintiff was entitled to the industrial-processing exemption for the entire electric system.[14]

To determine the "percentage of exempt use to total use," MCL 205.94o(2), it is necessary to ascertain both the use of the property for exempt activity and the sum of the uses of the property for exempt and nonexempt activities. Then, the "percentage of exempt use to total use" must be determined on the basis of "a reasonable formula or method approved by the department." MCL 205.94o(2). Once this percentage has been identified, the industrial-processing exemption "is limited to" this percentage. *Id.*[15]

---

[14] In so concluding, the Court of Appeals relied on caselaw applying a version of the UTA that predated the enactment of MCL 205.94o and its apportionment provision. See, e.g., *Mich Milk Producers Ass'n v Treasury Dep't*, 242 Mich App 486, 495; 618 NW2d 917 (2000) (which applied a former version of the agricultural-production exemption, MCL 205.94(1)(f), and concluded that "concurrent taxable use with an exempt use does not remove the protection of exemption"). The Court of Appeals erred in this regard because before the enactment of MCL 205.94o, the industrial-processing statute, see former MCL 205.94(g), as amended by 1998 PA 491, did not include an apportionment provision. See *Mich Allied Dairy Ass'n v State Bd of Tax Admin*, 302 Mich 643, 650; 5 NW2d 516 (1942) ("Where an article has more than one use, one or more (but not all) of which are within the agricultural producing or industrial processing exemptions, the legislature could have provided that the portion of the value of the article representing its nonexempt uses should bear the tax, but it has not done so."). As the Legislature has now enacted an apportionment provision, MCL 205.94o(2), we conclude that plaintiff is not entitled to the full, but a proportionate, industrial-processing exemption for the electric system.

[15] These principles apply where, as here, tangible personal property is *simultaneously* used for exempt and nonexempt activities. These principles would equally apply when property is used during *discrete* periods for exempt and nonexempt activities. That is, when property is used exclusively for exempt activity during one period and exclusively for nonexempt activity during another period, it would still be necessary to determine "the percentage of exempt use to total use" under MCL 205.94o(2). Furthermore, when property is used exclusively for exempt activity without any use for nonexempt activity, it is unnecessary to address MCL 205.94o(2) because the taxpayer is entitled to claim the

19

In the case at hand, the record shows that the "exempt use" of the electric system includes, at a minimum, alteration of the voltage under MCL 205.94o(7)(a).[16] And "total use" of the electric system is the sum of the uses for such exempt activity plus the nonexempt "distribution" and "shipping" activities under MCL 205.94o(6)(b).

To be clear, we do not purport to recite a formula that applies to this case or any other case. Rather, MCL 205.94o(2) is quite clear that the "reasonable formula or method" must be "approved by the department [of Treasury]." We simply hold that under MCL 205.94o(2), when property is simultaneously used for both exempt and nonexempt activities, defendant must give some recognition to both exempt and nonexempt activity in calculating "total use" under MCL 205.94o(2). That is, defendant cannot conclude under the statute that the nonexempt activity or activities wholly trump the exempt activity. Conversely, defendant cannot conclude under the statute that the exempt activity wholly trumps the nonexempt activity or activities.

---

industrial-processing exemption on 100% of the property used for industrial-processing activity, although application of the apportionment formula of MCL 205.94o(2) would nonetheless compel the same result.

[16] We do not express an opinion regarding whether elements of the electric system are also being used for other exempt "industrial processing" activities under MCL 205.94o(3). Accordingly, we reemphasize that we have not necessarily accepted plaintiff's argument that elements of the electric system are used for exempt "industrial processing" under MCL 205.94o(3)(d)-- as opposed to under MCL 205.94o(7)(a)-- with regard to which we *do* accept the argument that exempt "industrial processing" occurs. Ultimately, in approving an apportionment formula pursuant to MCL 205.94o(2), defendant shall assess all possible activities consistently with the principles set forth in this opinion.

We emphasize defendant's role in approving "a *reasonable* formula or method" to determine the "percentage of exempt use to total use" pursuant to MCL 205.94o(2) (emphasis added). The "percentage of exempt use to total use" will in many cases be a highly fact-specific inquiry that depends on a multitude of considerations, and we do not intend to suggest that apportionment under MCL 205.94o(2) can be ascertained and applied without regard to the unique character and extent of the various uses of the property.[17]

Defendant has contended throughout these proceedings that plaintiff is not entitled to any industrial-processing exemption for the electric system. For the reasons explained herein, we disagree because the electric system is simultaneously used for exempt and nonexempt activities, and MCL 205.94o(2) provides that plaintiff is entitled to the industrial-processing exemption on the basis of the "percentage of exempt use to total use" of the electric system. This percentage is to be "determined by a reasonable formula or method approved by the department [of Treasury]." Because the electric system is used for at least some exempt activity relative to total activity, defendant's determination that plaintiff is not entitled to any industrial-processing exemption is inconsistent with MCL 205.94o(2). Therefore, we remand to the Court of Claims for defendant to approve a "reasonable formula or method" for determining the "percentage of exempt use to total

---

[17] Because MCL 205.94o(2) sets forth the applicable apportionment formula, we conclude that Mich Admin Code, R 205.90(8) is not controlling to the extent that it conflicts with MCL 205.94o(2).

use" consistent with the principles set forth in this opinion and subject to the initial review of the Court of Claims.[18]

## IV. RESPONSE TO DISSENT

According to the dissent, "[t]he purpose of what DTE claims as industrial processing is . . . simply a means of distributing its product—electric power—most efficiently, not a means of producing a different product." *Post* at 6. We respectfully disagree. The electricity is initially generated at about 15,000 to 25,000 volts, so the voltage must necessarily be altered before a useable product has been made available. Therefore, even assuming for the sake of argument that the "purpose," as opposed to the physical reality, of an activity is determinative with regard to whether a taxpayer is entitled to the industrial-processing exemption, see MCL 205.94o(2), altering the voltage of electricity to render it usable by customers fully serves an industrial-processing purpose.

The dissent concludes that altering the voltage does not constitute "industrial processing" activity under MCL 205.94o(7)(a) because "[t]he fundamental nature of electricity—the flow of electrons—is not fundamentally altered after leaving the production facility." *Post* at 7. We disagree because "industrial processing" activity

---

[18] We recognize that neither party has yet sought to identify the "percentage of exempt use to total use" consistently with the principles set forth in this opinion. Instead, plaintiff has consistently asserted that it is entitled to a 100% exemption for the electric system, while defendant has consistently asserted that plaintiff is entitled to no exemption. We find it necessary to remand to the Court of Claims for further proceedings because, in our judgment, defendant has not yet satisfied its statutory obligation to approve a "reasonable formula or method."

22

under MCL 205.94o(7)(a) is not limited to those situations in which the "fundamental nature" of the tangible personal property at issue-- here, electricity-- is "fundamentally altered." Rather, "industrial processing" activity under MCL 205.94o(7)(a) is defined more broadly to encompass actions that result in "changing the form, composition, quality, combination, or character" of the property. In our view, such changes unquestionably take place in the instant circumstances.

We also believe that the dissent errs by failing to give meaning to the *entire* definition of "industrial processing," in particular the language providing that "[i]ndustrial processing . . . ends when finished goods *first come to rest in finished goods inventory storage*." MCL 205.94o(7)(a) (emphasis added). Even if the dissent is correct that electricity constitutes a "finished good" at the moment it leaves the generation plant-- notwithstanding that it is altogether unusable by any actual consumer until final delivery-- there is no point at which electricity "first come[s] to rest in finished goods inventory storage." By concluding that "industrial processing" activity under MCL 205.94o(7)(a) ends when electricity leaves the generation plant, the dissent reads the language "first come[s] to rest in finished goods inventory storage" out of the statute entirely, contrary to all traditional rules of statutory interpretation. See *Hannay v Transp Dep't*, 497 Mich 45, 57; 860 NW2d 67 (2014) ("[C]ourts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that renders nugatory or surplusage any part of a statute.") (citation and quotation marks omitted).[19]

---

[19] Although not entirely clear, the dissent appears to suggest that exempt "industrial processing" activity generally occurs only within a factory, and, therefore, "industrial

23

Furthermore, we also disagree with the dissent because it fails to take into account that tangible personal property can be *simultaneously* used for exempt "industrial processing" activity under MCL 205.94o(7)(a) and MCL 205.94o(3) and nonexempt "distribution" and "shipping" activities under MCL 205.94o(6)(b). There is no language in the industrial-processing statute that provides that the use of tangible personal property for one or more nonexempt activities forecloses the simultaneous use of that same property for exempt "industrial processing" activity. Accordingly, the activities enumerated in MCL 205.94o(6)(b) are not "specific modifier[s]" to the "general definition" of industrial processing set forth in MCL 205.94o(7)(a), as defendant suggests. Rather, MCL 205.94o(6) sets forth those activities that do *not* constitute "industrial processing," and MCL 205.94o(7)(a) and MCL 205.94o(3) set forth the activity that *does* constitute "industrial processing."

## V. CONCLUSION

The industrial-processing exemption provides that it is applicable to "the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at

---

processing" activity outside a factory is generally nonexempt activity. To the extent this is the dissent's view, we respectfully disagree. The language "first come[s] to rest in finished goods inventory storage" clearly contemplates that exempt "industrial processing" activity may occur within or without the factory. Moreover, we are not the first court to conclude that industrial processing and delivery are not mutually exclusive. See, e.g., *Mich Allied Dairy Ass'n*, 302 Mich at 649-650 (holding the fact that milk bottles and cans were used for delivery to the consumer did not render them nonexempt given that the bottles and cans were also used for industrial processing).

24

retail . . . . Industrial processing . . . ends when finished goods first come to rest in finished goods inventory storage." MCL 205.94o(7)(a). Altering the voltage "condition[s]" the electricity by changing its "quality" and "character" "for ultimate sale at retail." Furthermore, electricity is not a "finished good" until it is set at a usable voltage, and it does not "come to rest in finished goods inventory storage" at any point throughout the electric system. Industrial processing therefore occurs throughout the electric system. Because exempt and nonexempt activities are simultaneously occurring, it is necessary to determine the "percentage of exempt use to total use" by identifying and comparing the use of the property for exempt activity with the use of the property for all activities, both exempt and nonexempt. MCL 205.94o(2).

This percentage must be determined on the basis of a "reasonable formula or method approved by the department [of Treasury]." *Id.* The record has not been sufficiently developed in this regard. Therefore, a remand to the trial court is necessary for defendant to approve a "reasonable formula or method" to determine the percentage of plaintiff's exempt use to total use of the electric system and, thus, the industrial-processing exemption to which plaintiff is entitled. The trial court must review this formula or method in light of the statute and enter an order consistent with the reasonable formula or method. Accordingly, we affirm the judgment of the Court of Appeals in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

> Stephen J. Markman
> Robert P. Young, Jr.
> David F. Viviano
> Richard H. Bernstein

25

STATE OF MICHIGAN

SUPREME COURT

DETROIT EDISON COMPANY,

        Plaintiff-Appellee,

v                                     No. 148753

DEPARTMENT OF TREASURY,

        Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

I respectfully dissent from the majority's conclusion that plaintiff, Detroit Edison Company (DTE), engages in industrial processing after electric power leaves its plants. While DTE engages in industrial processing when, at the plant, it takes in raw materials and transforms those raw materials into electric power,[1] industrial processing ends once the electric power leaves the plant. Electric power generated at the power plant is distributed through the electric grid. While its voltage is adjusted as it travels through the electric grid, the "thing" produced—electric power—is not. Like ordinary industrial goods that are packaged for efficiency, DTE transmits the same electric power on high voltage wires to reach customers.

_____

[1] Electric power generated at a plant is measured in wattage. See 2 *Shorter Oxford English Dictionary* (6th ed) (defining "wattage" as "an amount of electrical power"). That the primary function of plants is to generate power is reflected in the commonly used term "power plant."

As a result, I would hold that, because the electric power does not change after it leaves DTE's production facility, it is a finished good at that time. Because DTE's shipping and distribution of electricity does not constitute industrial processing, it is not entitled to the industrial-processing exemption for equipment located outside its production facilities. For these reasons I would not address the issue of apportionment, as it is not necessary in this case. Instead, I would reverse the Court of Appeals, vacate the judgment of the Court of Claims, and remand this case to the Court of Claims for further proceedings.

## I. LEGAL ANALYSIS AND APPLICATION

The Michigan Use Tax Act, MCL 205.91 *et seq*., imposes a tax on every person "for the privilege of using, storing, or consuming tangible personal property in this state at a rate equal to 6% of the price of the property."[2] MCL 205.94o(1)(a) provides the general rule that the use tax "does not apply to property sold to" "[a]n industrial processor for use or consumption in industrial processing."

MCL 205.94o both defines "industrial processing" and provides specific examples of what activities are included and excluded from that definition. Subsection (7)(a) defines "industrial processing" as:

> [T]he activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail or affixed to and made a structural part of real estate located in another state. Industrial processing begins when tangible personal property begins movement from raw materials

---

[2] MCL 205.93(1).

storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage.

Subsection (6)(b) specifies, in relevant part, that industrial processing does *not* include "[s]ales, distribution, warehousing, shipping, or advertising activities." Subsection (3)(d) in turn provides that industrial processing includes, among other activities, "[i]nspection, quality control, or testing to determine whether particular units of materials or processes conform to specified parameters at any time before materials or products first come to rest in finished goods inventory storage." This Court has clarified that "to determine whether the industrial processing exemption applies [in a particular case], it is necessary to consider the activity in which the equipment is engaged and not the character of the equipment-owner's business."[3]

Producing and transmitting electricity requires an integrated, interrelated, and interconnected system that includes generation plants, substations, transmission lines, distribution systems, transformers, and meters spread over a large geographic area, known as the electric system. Typically, electricity is first produced by converting raw materials such as coal, oil, or natural gas into heat. That heat then boils water to form steam, which turns a turbine shaft connected to a generator.[4] "[A] generator is a magnet spinning inside a coil of wire," inducing an electric current in the coil.[5] Defendant, the

---

[3] *Elias Bros Restaurants, Inc v Treasury Dep't*, 452 Mich 144, 157; 549 NW2d 837 (1996).

[4] Barnett & Bjornsgaard, *Electric Power Generation: A Nontechnical Guide* (Tulsa: PennWell Publishing Co, 2000), p 112.

[5] *Id.* at 101.

Department of Treasury (the Department), concedes, and I agree, that this process constitutes industrial processing.

The Department, however, maintains that DTE's subsequent activity—transmitting and distributing electricity—is not "industrial processing" under the plain language of MCL 205.94o. Rather, industrial processing ends when transmitting and distributing begin, whether the consumer good is electricity or any other product. In contrast, DTE claims that the exemption applies to property used up to the point when finished goods arrive at inventory storage, which, it argues, occurs when the electricity enters into a customer's meter. To determine which interpretation controls, this Court must determine the Legislature's intended scope of the industrial-processing exemption as applied to the production of electricity.

### A. DEFINITON OF INDUSTRIAL PROCESSING

The Legislature presumably had the basics of industrial processing in mind when crafting the industrial-processing exemption. Raw materials are brought into a production facility and then used to create a good by " 'a process of manufacturing, development, [and] preparation for the market.' "[6] The newly produced good must then be transported to a retailer or customer. Typically, a definite and distinct point in time delineates when the manufacturer ceases production of a good and begins distribution. Once distribution begins, the manufacturer cannot claim the industrial-processing exemption for property that it uses in that activity.

___

[6] *Bay Bottled Gas Co v Mich Dep't of Revenue*, 344 Mich 326, 330; 74 NW2d 37 (1955), quoting *Moore v Farmers Mut Mfg & Ginning Co*, 51 Ariz 378, 382; 77 P2d 209 (1938).

4

While electric power does not seem to fit neatly within this description of manufacturing, DTE creates electricity using raw materials, and this newly created electricity leaves the power plant destined for end users. While electricity cannot be packed into a shipping container and delivered on a truck or train, as many consumer goods can be, the General Sales Tax Act[7] nevertheless recognizes electricity as tangible personal property.[8]

DTE argues that industrial processing is clearly defined in the statute and is not complete until its good, electricity, is in its final form, usable by and ready for sale to the customer.[9] It claims that equipment located outside the generation plant converts, conditions, and changes the character of the electricity and that this process is necessary before the electricity is ready for customers. DTE claims that the character of electricity is constantly changing during this phase.

Contrary to DTE's claims, power that has left DTE's plants does not change in "form, composition, quality, combination, or character . . . ."[10] The Court of Appeals erred when it overemphasized DTE's claim that the electricity is not in its final, safe form until it reaches customers. DTE creates a consumable good, electricity, and as with any good, DTE requires a means to distribute and transport this good to its customers. While

---

[7] MCL 205.51 *et seq*.

[8] MCL 205.51a(q) (" 'Tangible personal property' means personal property that can be seen, weighed, measured, felt, or touched or that is in any other manner perceptible to the senses and includes electricity, water, gas, steam, and prewritten computer software.").

[9] See MCL 205.94o(7).

[10] MCL 205.94o(7)(a).

the electricity's voltage happens to be reduced during the distribution process for purposes of efficiency, the fundamental nature of the electric power never changes. On this point, the expert testimony proffered by the Department is instructive: "Through the use of transformers stepping up and stepping down the voltage, the composition and character of the electricity is not changed."[11] While transformers assist in distributing, transmitting, and delivering electricity to DTE's customers, they do not alter the nature, composition, or character of electric power initially generated at a power plant. Producing electricity at a high voltage rate allows DTE to supply its product more efficiently across further distances, thus allowing it to create a larger customer base. The purpose of what DTE claims as industrial processing is, therefore, simply a means of distributing its product—electric power—most efficiently, not a means of producing a different product.[12] Indeed, as "[t]angible personal property used or consumed for the

---

[11] See also *Detroit Edison Co v Treasury Dep't*, 303 Mich App 612, 616; 844 NW2d 198 (2014). The majority cites caselaw holding that milk pasteurization qualifies as industrial processing for purposes of the use-tax exemption and suggests that the same principle applies to electric power. See *Mich Allied Dairy Ass'n v State Bd of Tax Admin*, 302 Mich 643, 648-650; 5 NW2d 516 (1942). Unlike milk pasteurization before distribution, however, altering the voltage of electricity during the distribution process does not alter its composition or character. Rather, DTE made a business decision to step down the voltage of electricity in distributing it to customers, while Michigan law requires milk producers to pasteurize milk, a complex process which by its very nature is intended to change the composition and character of the product before it is offered for sale. See MCL 288.538.

[12] Other producers of electricity confirm that electricity is substantially unchanged after it leaves the production facility. See Kentucky Association of Electric Cooperatives, Inc., *How is Electricity Generated & Distributed?* <http://www.kaec.org/energy/article1.htm> (accessed June 19, 2015) [http://perma.cc/J9X3-S5UC] ("Once the turbines generate the electricity, its voltage is significantly increased" before it is "routed onto a network of high-voltage transmission lines capable of efficiently transporting electricity over long distances."); General Electric, *Electricity 101 - Learn the Basics of Production*

6

*preservation or maintenance* of a finished good," the equipment DTE uses to preserve and maintain the flow of energy is explicitly excluded from the definition of industrial processing.[13]

Electric power is a good capable of sale, but it must be transmitted to customers like any other good. The fundamental nature of electricity—the flow of electrons—is not fundamentally altered after leaving the production facility.

## B. SPECIFIC EXCLUSIONS FROM "INDUSTRIAL PROCESSING"

This conclusion finds further support in MCL 205.94o(6)(b), under which the Legislature specifically excluded certain activities, including "[s]ales, distribution, warehousing, shipping, or advertising activities," from the industrial-processing exemption. Additionally, as noted earlier in this opinion, MCL 205.94o(5)(i) excludes "[t]angible personal property used or consumed for the preservation or maintenance of a finished good."

The Department maintains that industrial processing does not include the activity of conveying a product to a customer through shipping or distribution.[14] Indeed, even if an activity would otherwise qualify as "industrial processing" under the statutory

---

<https://powergen.gepower.com/plan-build/tools-resources/power-generation-basics/electricity-101.html> (accessed June 19, 2015) [http://perma.cc/95UD-MQD3] ("Thick wires carry the electric current from the generator to a transformer, which increases the voltage of the electric current to 500,000 volts or more, before electricity can be sent to the power grid.").

[13] MCL 205.94o(5)(i) (emphasis added).

[14] See MCL 205.94o(6)(b).

definition of that term, when an enumerated exclusion applies, the activity is not considered industrial processing for purposes of the exemption.[15] This is consistent with the rule of statutory construction that, when a general statutory definition conflicts with a specific modifier of that definition, the specific modifier trumps the general definition.[16]

Because distribution and shipping are not defined in the statute, each term must be given its plain meaning.[17] "Shipping" is defined as "[t]he act or business of transporting goods."[18] "Distribution" is a derivation of the verb "distribute," which means "[t]o divide and dispense in portions; parcel out."[19] Therefore, relevant to this case, shipping and distribution refer to the transmission of goods from an industrial processor to the consumer.

Because both distribution and shipping are excluded from the definition of industrial processing, activity occurring after the production of a good is not part of the industrial processing of that good. I agree with the Department that electricity is a vendible good when it leaves the production facility because it is capable of sale at that point. Therefore, the equipment used by DTE to convey that vendible good from its plants to its customers does not qualify for the industrial-processing exemption. Once the

---

[15] *Granger Land Dev Co v Treasury Dep't*, 286 Mich App 601, 608-610; 780 NW2d 611 (2009).

[16] *Evanston YMCA Camp v State Tax Comm*, 369 Mich 1, 8; 118 NW2d 818 (1962).

[17] *Haynes v Neshewat*, 477 Mich 29, 36; 729 NW2d 488 (2007).

[18] *The American Heritage Dictionary of the English Langauge*, *New College Edition* (1981).

[19] *Id*.

8

electricity leaves its plants, DTE delivers its product.  The power lines and equipment outside its plants are simply the means by which DTE delivers the electric power that has been generated at its plants.

### C.  SPECIFIC INCLUSIONS IN "INDUSTRIAL PROCESSING"

Nevertheless, DTE argues that it is engaged in activities that are specifically included in the statutory definition of industrial processing: inspection, quality control, and testing.  While the Court of Appeals and the majority in this Court have accepted this argument, I do not.

MCL 205.94o(3)(d) specifically includes within the industrial-processing exemption equipment used for "[i]nspection, quality control, or testing to determine whether particular units of materials or products or processes conform to specified parameters at any time before materials or products first come to rest in finished goods inventory storage."  Neither DTE nor the Court of Appeals has accounted for the fact that the electricity is a vendible good *as soon as it leaves* the production facility.  To be included within the definition of "industrial processing" for purposes of the exemption, MCL 205.94o(3)(d) requires that the "[i]nspection, quality control, or testing" occur "*before materials or products first come to rest in finished goods inventory storage.*"[20] The presence or absence of a physical storage location is not dispositive of whether an activity meets the requirement of MCL 205.94o(3)(d).

---

[20] Emphasis added.

9

The majority sidesteps the fact that electricity *never* comes to "rest." Indeed, DTE's own expert stated that the inspection, quality control, and testing occur after the electricity leaves the plant simply because it promotes the efficient distribution of DTE's product: "It is not practical under the laws of physics . . . for generation plants to produce electricity at the 120/240 volt level as it would require a wire that is 46 [times] greater in circumference than what is available." The changes to the voltage, therefore, make it efficient to distribute electricity; they do not affect the *production* of electricity or the quantum of power generated that leaves the power plant. It is that amount that is quantified to determine the power plant's output and must be considered the fixed goods inventory storage as contemplated in MCL 205.94o.

The majority denies that electricity comes to rest in a finished goods inventory storage at any point. I disagree. The phrase "finished goods inventory storage" must be interpreted in the context of how electricity is actually produced and distributed. While electric power *never* "comes to rest" at all, the statute does not require goods to be stored in a physical or fixed location before being considered ready for distribution. Rather, the goods must reach a point at which shipping and distribution are appropriate. Consider, hypothetically, a widget that is produced on a conveyor belt that empties into a waiting delivery truck, which then leaves the facility the moment the widget is placed in the truck. Under this circumstance, industrial processing ceases when the widget is placed on the truck, even though it never comes to rest in a physical storage location before distribution. It is logical to reach the same conclusion here, given that the Legislature defined "tangible personal property" to include electricity. It is appropriate to judge

10

DTE's activities by demarcating the line separating the production of electricity from *distribution* to consumers.[21]

Because DTE only engages in shipping and distributing electricity once the electricity leaves its production facilities, it does not use any property in industrial processing outside its production facilities under the industrial-processing exemption. Therefore, all equipment used in transmitting and distributing electric power outside its generating plants is subject to the use tax.[22]

## II. CONCLUSION

The majority characterizes changes in the voltage of electricity as industrial processing. I disagree. Changes in voltage merely affect the form in which electric power is distributed. DTE only transmits electricity at high voltages to provide for its efficient distribution. DTE is free to choose the most appropriate manner in which to send its product to customers. But that choice does not qualify it for the industrial-processing exemption with regard to the property used in carrying out that choice.

As the Department concedes, DTE engages in industrial processing inside its power plants when it uses industrial machinery to produce electricity. It is therefore

---

[21] While I conclude that apportionment is not necessary, because no industrial processing occurs after electricity leaves DTE's production facilities, nothing in this opinion would preclude apportionment if necessary.

[22] Because I conclude that none of DTE's property outside its production facilities is exempt for purposes of the industrial-processing exemption, I do not consider how to apportion the exemption between exempt uses of the property and nonexempt uses under MCL 205.94o(2).

11

entitled to the industrial-processing exemption from the use tax on property used during that process. However, once the electricity leaves DTE's power plants, the electricity is, and must be, consumed by the end users to whom it is distributed. Personal property used during this distribution process is therefore beyond the scope of the industrial-processing exemption and is subject to the use tax. I would thus hold that DTE may not claim any use-tax exemption for personal property used to distribute and transport electricity from its plants to customers. Therefore, I respectfully dissent and instead would reverse the Court of Appeals' judgment that DTE is entitled to an industrial-processing exemption for equipment located outside its production facilities, vacate the judgment of the Court of Claims, and remand this case to the Court of Claims for further proceedings.

Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack

12