*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TRUGREEN LIMITED PARTNERSHIP,

      Plaintiff-Appellant,

v

DEPARTMENT OF TREASURY,

      Defendant-Appellee.

FOR PUBLICATION
April 10, 2020

No. 344142
Court of Claims
LC No. 17-000141-MT

Before: SHAPIRO, P.J., and GLEICHER and SWARTZLE, JJ.

SWARTZLE, J. (*dissenting*)

Some tax cases present questions of byzantine statutory construction. One's Latin must be refreshed, venerable treatises and opinions consulted, the warp and woof of the code analyzed, all in an effort to unearth the meaning of oft-obscure, technical language.

This is not one of those cases—or, rather, it should not have been one.

As it must, the legal analysis follows, but the analysis seems superfluous. The reasonable reader knows what "things of the soil" means, a vegetative entity of some sort (e.g., a wheat plant, a shrub). This reader knows that every "product" is a thing, but not every "thing" is a product, so it logically follows that every "product of the soil" (a/k/a agricultural product) is a thing of the soil, but not every "thing of the soil" is a product of the soil. This reader knows that farmers plant seeds and care for plants so that agricultural products can be reaped, but this reader also knows that others plant seeds and care for plants for purposes apart from such reaping. This reader knows that when the Legislature removes words that were actually in a statute or bill (e.g., "agricultural product," "agricultural production," "agricultural purpose"), it does so for a reason. This reader knows that an imprecise label like "agricultural-production exemption" does not become more precise through mere repetition. And last but certainly not least, this reader knows that, under the separation of powers enshrined in our Constitution, the Executive and Judicial branches are supposed to defer to the Legislature on matters of public policy like tax law. This is all that a reasonable reader needs to know to conclude that the taxpayer in this case is entitled to the use-tax exemption.

-1-

The majority and department, however, read things differently. Because I cannot abide their reading, I respectfully dissent.

## I. STATUTORY INTERPRETATION IN GENERAL

Under separation-of-powers principles, courts must give effect to the Legislature's intent as expressed in statute absent a particular constitutional constraint. "Courts may not speculate regarding legislative intent beyond the words expressed in a statute." *Detroit Pub Sch v Conn*, 308 Mich App 234, 248; 863 NW2d 373 (2014) (cleaned up).

Therefore, to determine the meaning of a statute, we must first look to the text. When doing so, we must consider both the meaning of the particular term or phrase at issue as well as its statutory context and history. *People v Pinkney*, 501 Mich 259, 268 & 276-277 n 41; 912 NW2d 535 (2018); *2000 Baum Family Trust v Babel*, 488 Mich 136, 175; 793 NW2d 633 (2010). "If the language is clear and unambiguous, the plain meaning of the statute reflects the legislative intent and judicial construction is not permitted." *Universal Underwriters Ins Group v Auto Club Ins Ass'n*, 256 Mich App 541, 544; 666 NW2d 294 (2003) (cleaned up). "Only when ambiguity exists does the Court turn to common canons of construction for aid in construing a statute's meaning." *D'Agostini Land Co, LLC v Dep't of Treasury*, 322 Mich App 545, 554-555; 912 NW2d 593 (2018). "A statutory provision is ambiguous only if it irreconcilably conflicts with another provision, or when it is equally susceptible to more than a single meaning." *Id.* at 554 (cleaned up).

## II. THE TEXT, CONTEXT, AND HISTORY OF "THINGS OF THE SOIL"

To begin, I focus initially on the *actual* semantic meaning of the "things of the soil," then on the *actual* syntactic context of that phrase, and finally on the *full* statutory and legislative history of the exemption. This approach comports with the "fair reading" school of interpretation: "The interpretation that would be given to a text by a reasonable reader, fully competent in the language, who seeks to understand what the text meant at its adoption, and who considers the purpose of the text but derives purpose from the words actually used." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, (St. Paul: Thompson/West, 2012), p 428.

*The Specific Text.* The parties agree that TruGreen's refund claims are subject to the following exemption from the use tax:

> Property sold to a person engaged in a business enterprise and using and consuming the property in the tilling, planting, caring for, or harvesting of the things of the soil or in the breeding, raising, or caring for livestock, poultry, or horticultural products, including transfers of livestock, poultry, or horticultural products for further growth. . . . [MCL 205.94(1)(f), as amended by 2012 PA 474.]

Although the statutory provision can be subdivided in various ways, and some parts have no relevance to the dispute here (e.g., breeding of livestock), the provision sets forth two conditions relevant to this dispute that must be satisfied to qualify for the use-tax exemption—(1) the taxpayer must be engaged in a business enterprise; and (2) the property sold to the taxpayer must be used by that taxpayer for "planting" or "caring for . . . the things of the soil." There are no other listed

conditions or exceptions found in the text of MCL 205.94(1)(f) that are relevant to TruGreen's refund claims. Nor have the parties brought to the Court's attention any other provision of the tax code that expressly conditions or otherwise restricts TruGreen's claims, and my own review has likewise found none.

On its face, this provision has a rather straightforward application. If a taxpayer is engaged in a business enterprise, and if the business activity—with the attendant costs for property used to engage in the activity—includes planting or caring for "things of the soil," then the taxpayer qualifies for an exemption from the use tax. The phrase "things of the soil" is not defined in the statute, nor has it "acquired a unique meaning at common law" that should be read into the statute. *Pinkney*, 501 Mich at 273 (cleaned up). Turning to *The Oxford English Dictionary* (1933), the most relevant definitions of "thing" in this context are "An entity of any kind" and "Applied (usually with qualifying word) to a living being or creature; occasionally to a plant,"[1] and the phrase "of the soil" seems clearly to mean that the living being or entity comes from, lives in, is connected with, or is otherwise related to soil. And considering that each of the activities listed— "tilling, planting, caring for, or harvesting"—somehow involves vegetative growth (as opposed to worms and the like), it is evident that "things of the soil" means some kind of vegetative being or entity, i.e., beings or entities belonging to the plant kingdom.

With respect to TruGreen, the record confirms that it is a business enterprise and that it plants grass seed for some of its customers. More generally, in its brief on appeal, the department has **conceded** that TruGreen "cares for its customers' lawns, trees, and shrubs," and in the next sentence the department **equates this** with "caring for the things of the soil." The record supports this concession. Thus, based on a plain reading of the operative language of the tax exemption, it would appear that TruGreen is off to a good start.

*The Broader Statutory Context.* Turning to the broader statutory context, a careful analysis of the context supports this plain reading. To begin, the operative use-tax exemption language from the 2012 version can be grammatically outlined as follows:

- The following are exempt from the tax levied under this act,
  - Property sold
  - to a person
  - engaged in a business enterprise and
  - using and consuming the property
    - in the tilling, planting, caring for, or harvesting of the things of the soil or

---

[1] As explored in greater detail *infra*, the phrase "things of the soil" was added by our Legislature in 1949. Accordingly, when considering a particular word, the Court "must look to the meaning of words at the time they were enacted." *People v Rogers*, __ Mich App __, __; __ NW2d __ (2020) (Docket No. 346348); slip op at 6. As indicated in *The Oxford English Dictionary*, the meaning of "thing" referenced here derives from various texts, ranging in date from 888 to 1858 to 1910 CE. Apart from the occasional devotee of Martin Heidegger, it is doubted that any reasonable reader will take umbrage at the definition of "thing" offered here.

- in the breeding, raising, or caring for livestock, poultry, or horticultural products, including transfers of livestock, poultry, or horticultural products for further growth

Several observations flow from analyzing the context. First and most obviously, nowhere in this operative text is the term "agricultural production" or a similar term even found. This observation alone cuts against a contrary reading, given how easy it would have been simply to write— "agricultural products"—if that is what the Legislature had actually intended. (More on this later.)

Second, diving a bit deeper, structurally there are two wholly separate prepositional phrases, each beginning with "in," one ending with "things of the soil" and the other ending with "for further growth." The two phrases are separated by "or," and there is nothing to suggest that this "or" should be read as anything other than disjunctive. *Paris Meadows, LLC v Kentwood*, 287 Mich App 136, 148; 783 NW2d 133, 140 (2010). Thus, structurally each phrase stands separate on its own.

Flowing from the first and second observations, it is further observed that the only use of the term "products" in the entire exemption is with respect to the wholly separate phrase dealing with "livestock, poultry, or horticultural products." While one must be cautious not to put too much weight on the canon that "the express mention of one thing implies the exclusion of other similar things," *People v Garrison*, 495 Mich 362, 372; 852 NW2d 45 (2014), it does seem worth mentioning that this illustrates, at the very least, the Legislature's ability to limit the exemption with respect to certain kinds of "products" when it wants to do so, i.e., "livestock, poultry, or horticultural *products*."

Fourth, the four activities listed in the relevant phrase—"tilling, planting, caring for, or harvesting of"—are similarly separated by "or" rather than "and." There is nothing in the statute to suggest that this "or" should be read as a conjunctive, see *Root v Ins Co of North America*, 214 Mich App 106, 109; 542 NW2d 318 (1995), and, in fact, it appears quite clear that the exemption is available to a business enterprise that, for example, uses equipment to till "things of the soil" but does not also harvest those things. Thus, an entity need not engage in all four activities to be eligible for the exemption.

Fifth, the four activities all encompass the life cycle of a vegetative entity, but only a vegetative entity that involves some human management or involvement. The activities do not include, for example, the growth of a plant in the middle of a rainforest untouched by human hands. The activities are *human* ones (with or without the aid of machinery, chemicals, or other human technology), and the activities are centered on or otherwise involved in the care and management of a vegetative entity.

Sixth and finally, encompassed within the set of activities is certainly agricultural production. But the object of the activities—"things of the soil"—is not itself limited to agricultural products, and the four activities are necessarily broader than mere agriculture. One can certainly plant and care for a vegetative entity without necessarily harvesting something from it for sale in the future. A contrary reading would necessarily imply that any "thing[] of the soil" that is tilled, planted, cared for, or harvested would always and everywhere have to result in an

agricultural product. In other words, the contrary reading would equate *things of the soil that are tilled, planted, cared for, or harvested* with *agricultural products*.

But this is question begging and, more critically, it is a false equivalency. Many vegetative things (e.g., plants, flowers, trees) are planted or otherwise cared for, but do not themselves produce or otherwise result in a product for sale on the market. While it is not necessary to identify what "things of the soil" means in every conceivable context, it can be said with some confidence that "things" is a more expansive concept than "products." Thus, the set of all *"things of the soil" that are tilled, planted, cared for, or harvested* encompasses each and every agricultural product, but the set of all *agricultural products* does not encompass each and every "thing[] of the soil" that is tilled, planted, cared for, or harvested. Simply put, the phrase "things of the soil" in this context has a logically broader meaning than mere agricultural products.

The Legislature could have used the phrase "agricultural products" or even "products of the soil" as the object of the four listed activities, but it eschewed those and similar labels and instead chose a logically broader one, "things of the soil." Under the plain meaning and statutory context of the use-tax exemption, TruGreen remains on solid ground.

*The Lengthy History.* Next, statutory and legislative history. With respect to this history, it should be noted at the outset that (i) the history is lengthy and (ii) not outcome determinative, but (iii) several pertinent observations can be made. Taking a cue from the majority, I will not recite the full history of the exemption in exhaustive detail; instead, a few key highlights will suffice:

- In 1937, the Legislature enacted a use-tax exemption for "tangible personal property" used in "agricultural producing." [1937 PA 94 § 4(g).]

- In 1949, the Legislature revised the exemption by deleting "agricultural producing" and replacing the term with "things of the soil." It also added a certification provision for "horticultural or agricultural products." [MCL 205.94(1)(g), as amended by 1949 PA 273.]

- The Legislature revised the exemption again in 1970. This time it added a catch-line heading ("Agricultural production") and made other changes not relevant to this dispute. [MCL 205.94(f), as amended by 1970 PA 15.]

- The provision remained much the same until 2004, when the Legislature left out the catch-line heading and deleted the certification provision, among other revisions. This omitted *any* legislative mention of "agricultural production" with respect to the exemption. [MCL 205.94(1)(f), as amended by 2004 PA 172.]

- In 2008 and 2012, the Legislature made further minor revisions to the exemption. These are the provisions relevant to the tax years in question. The operative language is identical in both versions:

-5-

> (1) The following are exempt from the tax levied under this act, subject to subsection (2):
>
> * * *
>
> (f) Property sold to a person engaged in a business enterprise and using and consuming the property in the tilling, planting, caring for, or harvesting of the things of the soil or in the breeding, raising, or caring for livestock, poultry, or horticultural products, including transfers of livestock, poultry, or horticultural products for further growth. [MCL 205.94(1)(f), as amended by 2012 PA 474.]

In 2017, a package of bills amending various tax exemptions was introduced in our House of Representatives. Two of the bills, HB 4561 and HB 4564, involved exemptions for "things of the soil." As introduced, the bills would have made the exemptions expressly limited to "agricultural purposes"—i.e., the relevant language would have changed to ". . . . things of the soil *for agricultural purposes . . .*" (emphasis added). Not surprisingly, the department supported the change. The House passed the bills with the included express limitation, but the language was eventually stripped from the bills in the Senate. The Senate passed the bills without the language, the House concurred, and the Governor signed the bills. See 2018 PA 114. The current exemption thus reads:

> (1) The following are exempt from the tax levied under this act, subject to subsection (2):
>
> * * *
>
> (f) Except as otherwise provided under subsection (3), property sold to a person engaged in a business enterprise that uses or consumes the property, directly or indirectly, for either the tilling, planting, draining, caring for, maintaining, or harvesting of things of the soil or the breeding, raising, or caring for livestock, poultry, or horticultural products, including the transfers of livestock, poultry, or horticultural products for further growth. [MCL 205.94(1)(f), as amended by 2018 PA 114.]

What can the reasonable reader glean from this history? A few things. The original use-tax exemption was enacted in 1937 to focus on "agricultural producing," but then twelve years later, any mention of "agricultural producing" was omitted and replaced with "things of the soil." When the Legislature uses a different word or phrase in revising a statute, absent clear indication that it was done for purely stylistic reasons, the new word or phrase should signal a change in meaning. See *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009).

At the same time that the Legislature added "things of the soil," it also added the term "agricultural products" in the new certification provision. Yet, as this Court held in *William Mueller & Sons, Inc v Dep't of Treasury*, 189 Mich App 570, 574; 473 NW2d 783 (1991), the certification provision did not create a requirement related to "agricultural products," but rather provided a means for the creation of prima facie evidence in support of an exemption claim. Thus, the fact that the Legislature added the term "agricultural products" in 1949 is of little moment here. Moreover, the entire certification provision was omitted from the exemption in 2004.

-6-

At first blush, it would seem significant that the Legislature added the catch-line heading in 1970. The Legislature has long instructed, however, that catch-line headings "shall in no way be deemed to be a part of the section or the statute, or be used to construe the section more broadly or narrowly than the text of the section would indicate." MCL 8.4b. A catch-line heading is merely for the "convenience to persons using publications of the statutes," *id.*, and therefore courts and departments must ignore the heading for purposes of determining what the statute means, *In re Lovell*, 226 Mich App 84, 87 n 3; 572 NW2d 44 (1997). In any event, the catch-line heading was omitted by the Legislature in subsequent amendments. See, e.g., 2004 PA 172.

This statutory history, while somewhat muddled, does suggest that by at least 2004, the Legislature had settled on a broad exemption. Specifically, by 2004, (i) the Legislature had jettisoned the original "agricultural producing" scope and replaced it with "things of the soil"; (ii) it had added and then removed the narrower catch-line heading; and (iii) it had omitted any mention of "agriculture" or "agricultural" in the operative part of the exemption (the only references are later in the provision regarding land tiles). While not conclusive by itself, this history is consistent with and supports the reading presented here.

What to make of the recent legislative history, i.e., HB 4561 and 4564? In one respect, it is not relevant because we are interpreting prior versions of the statute. See *In re Certified Question*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). In another respect, however, it is relevant because this legislative activity shows, at a minimum, that the Legislature knows full well how to draft a provision that would clearly narrow the exemption to "agricultural purposes." In fact, the department supported such a provision, the House (originally) supported such a provision, but the Senate did not. By the time the Senate sent the legislation back to the House for a concurrence vote, the proposed provision had been stripped out and replaced with the existing provision ("things of the soil"), with nary a mention of "agricultural producing," "agricultural products," or "agricultural purposes."

The reasonable reader can speculate on why the language was removed as the bills traversed the Legislature. Maybe, for instance, some of the legislators observed that well-manicured lawns provide esthetic benefits to third parties, and those legislators wanted to subsidize the provision of such benefits.[2] Or, maybe, other legislators simply supported lower taxes on businesses like TruGreen. These and other speculations are, however, just that—speculations. What can be known for certain from the recent legislative activity is that (i) the Legislature was asked to narrow the exemption at the same time that this dispute was working its way through the

---

[2] Some have argued that tax laws must further some public good. There is no logical reason that esthetic goods—which grass, trees, and ornamental plants surely are—cannot be considered public goods. A public good is one whose benefit inures largely to the public as opposed to a single person or firm—technically, the good is non-excludable and non-rivalrous. The esthetic values of well-manicured lawns, parks, and commercial and other public spaces are, by and large, non-excludable and the enjoyment by one does not diminish the enjoyment by another. Whether the esthetic values created by TruGreen's services *should* qualify as a "public good" for tax purposes is a policy question for the Legislature, not a judicial one for this Court or an administrative one for the department.

courts, (ii) the Legislature considered narrowing the language, but (iii) the Legislature ultimately rejected the narrower language. *Id.* (noting that the "highest quality" of legislative history is that which includes "actions of the Legislature in considering various alternatives in language in statutory provisions before settling on the language actually enacted").

After considering the text, context, and history of the use-tax exemption, where does this leave our reasonable reader? A few takeaways seem unavoidable. The meaning of the phrase "things of the soil" is broader than the phrase "agricultural products" or even "products of the soil." The context of the statute supports the plain, broader meaning of the phrase. And while not itself conclusive, the statutory and legislative history lends support to a broader understanding of the exemption, especially when the reader compares the phrase chosen and retained by the Legislature ("things of the soil") with the phrases rejected and jettisoned by it ("agricultural producing," "agricultural products," "agricultural purposes"). Frankly, one has to wonder how the Legislature could have more clearly evidenced that a broad meaning was intended. It replaced a narrow term with a broad one; it reserved the term "products" for a logically separate category in a grammatically separate phrase; it eschewed any mention of "agriculture" or "agricultural" in the relevant part of the provision; and, when recently asked to modify "things of the soil" with "agricultural purposes," the Legislature said *No.*

Given all of this, I submit that the reasonable reader is left with but one conclusion— TruGreen qualifies for the use-tax exemption.

## III. THE MAJORITY OPINION

The reasonable reader need go no further. My analysis has been set out in detail, and the reader can compare this with the majority's analysis and determine on their own who has the sounder case. For those who want to press on, however, I offer a few additional observations, none of which are necessary to my analysis.

*Thumb on the Scale.* The majority starts out its opinion by placing a collective thumb on the interpretative scale in favor of the department. In support, the majority references a quote from Justice Cooley's treatise on taxation that the grant of an exemption " 'must be beyond reasonable doubt.' " *Detroit v Detroit Commercial College*, 322 Mich 142, 149; 33 NW2d 737 (1948), quoting 2 Cooley, Taxation (4th ed), § 672, p 1403. But this cannot be taken at face value. "Beyond reasonable doubt" is the burden needed for the government to take a person's liberty (and, in other jurisdictions, possibly even life) away; it cannot plausibly be the burden needed for a taxpayer to obtain a tax exemption. This rhetorical flourish should remain just that.

More substantively, while our Supreme Court has stated that courts should strictly construe tax exemptions, it has also clarified that this does not mean that tax exemptions should be given "a strained construction adverse to the Legislature's intent." *Michigan United Conservation Clubs v Lansing Twp*, 423 Mich 661, 665; 378 NW2d 737 (1985). "Like any other governmental intrusion on property or personal freedom, a tax statute should be given its fair meaning, and this includes a fair interpretation of any exceptions it contains." Scalia & Garner, *Reading Law*, p 362.

I read our case law to mean that, when construing a tax exemption, a court should—as with any other statute—start by analyzing the text, context, and history of the exemption using common,

generally accepted interpretive tools (e.g., definitions, rules of grammar, changes in statutory language). If the exemption is ambiguous (i.e., it irreconcilably conflicts with another provision or is equally susceptible to more than one meaning), only then should the court turn to various interpretive canons of construction, one of which being that when there remains doubt about a tax exemption's meaning, the push goes against the taxpayer. It is not at all clear to me how the majority is using the "strictly construed" canon, but I suspect it is using it more strictly than it should.

*Bones and Tarot Cards.* Even more concerning is the majority's contextual analysis. From what I can tell, the majority's analysis consists of ripping words from their context, jumbling them together, and then drawing conclusions from the resulting "collection of words and phrases." Take this example: "The exemption's first relevant sentence is a string of participles: tilling, planting, caring for, harvesting, breeding, and raising. The words describe actions respecting 'things of the soil' or 'livestock, poultry or horticultural products.' " Or take another example: "The words closely adjoining 'planting' and 'caring for things of the soil' are: 'tilling,' 'harvesting of things of the soil,' 'breeding,' 'raising,' 'caring for livestock, poultry, or horticultural products,' and 'the transfers of livestock, poultry, or horticultural products for further growth.' " Compare the majority's lists with the actual language of the statute set out earlier.

The majority has indeed identified a "collection of words and phrases" from the exemption—just not the "collection of words and phrases" as they actually appear in the actual statutory language. As shown earlier, the grammatical structure of the exemption does not suggest that "breeding" or "raising" has anything to do with "things of the soil." Nor does "livestock, poultry, or horticultural products" or "for further growth" having anything to do with the prior, separate prepositional phrase. In fact, the use of "products" in the separate phrase argues against the majority's reading, but by jumbling everything together into a "collection of words and phrases," the majority can infer meanings that are not there. This is a bones-and-tarot-cards method of contextual analysis.

*An Imprecise Label Does Not Become More Precise by Repetition*. The majority seems also to draw support from several prior decisions of this Court. Under principles of stare decisis, if our Supreme Court or a panel of this Court had held in a published decision that the department's interpretation was the correct one, then I would be bound to follow the holding, notwithstanding my understanding of the plain meaning of the statute set out earlier. See *Associated Builders and Contractors v Lansing*, 499 Mich 177, 191-192; 880 NW2d 765 (2016).

All parties agree that there is no Supreme Court decision on-point. As for the decisions of this Court cited by the majority, I readily concede that those decisions have referred to the exemption as the "agricultural production exemption." See, e.g., *Detroit Edison Co v Dep't of Treasury*, 498 Mich 28, 49 n 14; 869 NW2d 810 (2015); *Sietsema Farms Feeds, LLC v Dep't of Treasury*, 296 Mich App 232, 234; 818 NW2d 489 (2012); *Mich Milk Producers Ass'n v Dep't of Treasury*, 242 Mich App 486, 491; 618 NW2d 917 (2000). This is not surprising, though, since the Legislature at one time referred to this exemption by a similar catch-line heading (though no longer), and end uses of "things of the soil" certainly include (though are not limited to) agricultural products.

In *William Mueller & Sons*, 189 Mich App at 571, the taxpayer was assessed a use tax on fertilizer equipment that it claimed was involved in agricultural production. The Court held that the taxpayer qualified for the exemption because it was undisputed that the taxpayer was a business enterprise and the equipment was used in the "tilling, planting, caring for, or harvesting of things of the soil." *Id.* at 573. The Court rejected the department's position that the taxpayer had to be "in the business of producing agricultural products" for the exemption to apply. *Id.* at 573-574. Importantly for this case, there is no holding or even analysis in *William Mueller & Sons* related to what "things of the soil" means.

Likewise, the Legislature's intended scope of the phrase "things of the soil" was not at issue in *Mich Milk Producers Ass'n*, 242 Mich App 486, or *Sietsema Farms*, 296 Mich App 232. In *Mich Milk Producers*, 242 Mich App at 487-488, 495, there was no question that "milk production" was within the scope of the exemption, and the question was whether the use of the equipment was for producing milk (exempt) or marketing milk (not exempt). Similarly, in *Sietsema Farms*, 296 Mich App at 240, there was no question that feeding livestock and poultry fit within the scope of the exemption, and the question was whether the property was actually being used to feed livestock and poultry.

While I acknowledge that prior panels have used the term "agricultural production" to refer to the exemption, this Court is bound by the holdings of prior published decisions, not the shorthand labels used in those decisions. And an imprecise short-hand label does not become more precise with mere repetition.

## IV. THE DEPARTMENT'S REMAINING ARGUMENTS

In addition to those accepted by the majority, the department offers alternative arguments in support of its position. Unlike those accepted by the majority, these other arguments have little to do with the statute's text. The department asserts, for instance, that use-tax exemptions are intended to prevent the pyramiding of taxes on commercial products. Tax pyramiding means the imposition of a tax on a tax, and for those who want their taxes to be transparent, such pyramiding is generally frowned upon. Because TruGreen's services do not directly or even indirectly result in the sale of a taxable agricultural product to an end-user, the department maintains that there is no risk of pyramiding a sales tax on top of a use tax, and, therefore, the purpose of the exemption would be undermined if TruGreen received the use-tax exemption.

Accepting that tax pyramiding is a policy vice to be avoided, the department's reliance on this argument has several flaws. Rather than cite to the "highest quality" of legislative history in support of its argument, such as actual, official activity of the Legislature (e.g., votes and amendments), *In re Certified Question*, 468 Mich at 115 n 5, the department points us to a journal article and a legislative analysis. Neither is particularly reliable in determining whether MCL 205.94(1)(f) was intended, in fact, to eliminate any risk of tax pyramiding with respect to "things of the soil."

Furthermore, although the department couches this as an argument from historical development, this is really an argument from policy implication. The department has identified a cogent tax policy—use-tax exemptions are intended to avoid tax pyramiding—and because TruGreen's commercial activities purportedly do not run the risk of tax pyramiding, then the

rationale for the tax policy does not support an exemption for TruGreen. But, as this Court recognized in *D'Agostini*, 322 Mich App at 560, "It is not our place to divine *why* the Legislature" enacted a tax statute to favor or disfavor a particular taxpayer or taxable activity. "Rather, it is our place only to determine *whether* the Legislature did or did not do so . . . ." *Id.* Similarly, our Supreme Court made clear in *Pinkney*, 501 Mich at 285-288, that if the plain meaning of the statute is clear but a court believes that the Legislature made a mistake that "frustrates [the] purpose" of the statute, then the court must apply the statute as written and leave it to the Legislature to determine whether a change is needed.

In fact, the very concept of tax pyramiding is suspect with respect to agricultural products. To illustrate, it is important to recognize first that many agricultural products are ultimately sold to end users as food or food ingredients for human consumption. In Michigan, most food for human consumption is exempt from sales tax, MCL 205.54g(1)(a), so there is no risk of tax pyramiding with respect to these food products, at least as it relates to the imposition of a sales tax on an end-product on top of a use tax on the inputs of production. And yet, even though there is no risk of tax pyramiding on sweet corn, for example, a Michigan farmer would likely be eligible for a use-tax exemption when harvesting sweet corn for sale at the local farmers' market. This is not the place nor the record for an extensive examination of tax pyramiding with respect to all agricultural products, but needless to say, the department's policy-based argument—(i) TruGreen's services are not subject to sales tax, (ii) tax pyramiding is not a risk, and therefore (iii) the use-tax exemption does not apply—has little persuasive force here.

Finally, the department asks this Court to defer to Rule 205.51, the department's administrative rule implementing the use-tax exemption. Unlike the statute itself, the rule specifically prohibits a taxpayer from claiming a use-tax exemption where the property is for "use on homes or other noncommercial gardens, lawns, parks, boulevards, and golf courses or for use by landscape gardeners." The department promulgated the rule under the administrative procedures act of 1969, MCL 24.201 *et seq.*, in accordance with authority delegated to it by the Legislature, MCL 205.3(b), 205.59(2), and 205.100(2). Yet, because the statute is clear that "things of the soil" is broader than mere agricultural production, the department cannot impose a requirement that the Legislature did not see fit to add itself. "An administrative rule cannot exceed the statutory authority granted by the Legislature." *William Mueller & Sons*, 189 Mich App at 574.

## V. CONCLUSION

Tax laws have consequences. Some consequences might be thought of as "intended"— e.g., raising revenue, avoiding pyramiding, cultivating a favored industry—and some might be thought of as "unintended"—e.g., a "tax loophole" if favoring the taxpayer, a "jobs killer" if disfavoring the taxpayer. The reasonable reader might surmise that TruGreen was not whom the Legislature considered when it enacted and subsequently amended (several times) the use-tax exemption for "things of the soil."

But this surmising is outside of the Court's proper role and institutional competence. See *People v Al-Saiegh*, 244 Mich App 391, 399; 625 NW2d 419 (2001). Our role, rather, is to interpret and apply the statute as-written, and when, as here, the text has a plain meaning, supported by context and history, then it is that plain meaning that we should apply. Once we have laid the particular consequence bare, it is up to the Legislature to determine whether it intends the

consequence to endure or not. With its ruling today, the majority has stepped outside of our proper role and competency. And finally, speaking of consequences, it will not be lost on the reasonable reader that, although no doubt unintended by the majority, the unavoidable consequence of today's ruling is that the department has gained in the Judiciary what could not be gained in the Legislature.

For all of these reasons, I cannot join the majority and thus respectfully dissent.

POSTSCRIPT

There is a certain futility when a dissent responds to a separate concurring opinion. Neither opinion garnered a majority vote, so it is just one failed opinion responding to another failed opinion. Frankly, had the concurring opinion concluded with its Part III, this postscript would not have been written.

After all, does it really need to be observed that there is a certain disconnect in suggesting, on the one hand, that a phrase is "most certainly obscure," but then asserting, on the other hand, that the phrase is a well-established term of art based on decades of case law—case law without a single holding to that effect? Does it really need to be pointed out that in the use of context, the concurring opinion repeats (and compounds) the majority's error of abusing context by picking a phrase in one part of the sentence ("horticultural products") and applying it to a grammatically separate part? Does it really need to be said that, with respect to the department's interpretation, I have given it the same respectful consideration as did its own referee at the outset of this tax dispute? These hardly seem points worth making in response to the concurring opinion.

But then we get to Part IV and the so-called "fetishization of dictionaries." Several observations are in order. First, that is a rather odd accusation, but let us leave the word choice alone and get to the substance. Second, for the life of me I cannot find anything in the dissent to suggest that the use of *The Oxford English Dictionary* absolves this Court from "reasoned good-faith discussion, analysis of caselaw and context, and stare decisis." Maybe I shouldn't have summarized my dissenting analysis in the introduction? Maybe I should have moved my discussion of case law and stare decisis closer to the beginning? I thought these were merely stylistic choices.

Third and more substantively, this is not the place for a general defense of the use of dictionaries to aid with the interpretation of statutes and contracts. There are already two long, detailed opinions and a separate concurring opinion, so whatever follows after the proverbial beating of the dead horse, we're there. So, my concluding observations. A dictionary is a tool for interpretation, nothing more, nothing less. Just as a hammer is a tool that can be used expertly, poorly, or even maliciously (just ask Rusty Sabich's wife in *Presumed Innocent*), the same can be said about a dictionary. Scalia & Garner, *Reading Law*, pp 415-424. And, just as an expert carpenter may use a hammer and other tools to construct a new kitchen, the expert judge may use a dictionary and other tools to interpret a statue or contract. Given that the concurring judge has done precisely this in literally dozens of opinions as recently as October 2019 for such obscure terms as "should," *Jendrusina v Mishra*, 316 Mich App 621, 626 & n 1; 892 NW2d 423 (2016), "continuing," *People v Carll*, 322 Mich App 690, 704-705; 915 NW2d 387 (2018), and "health care," *People v Anderson*, __ Mich App __; __ NW2d __ (2019) (Docket Nos. 343272-343281), slip op at 7 & n 6, I presume that the concurring judge understands this proper usage, but he just

wants to make a rhetorical point. Fair enough, but was the concurring judge eschewing his "constitutional role" in those and scores of other cases when he consulted a dictionary?

We expect citizens to abide by our government's laws, and this is right. We use the government's police powers to enforce those laws, and this is also right. Is it going too far to suggest that a citizen should be able to use a good dictionary from the shelf as one tool in the interpretive toolbox to understand what our government's laws mean? It seems rather undemocratic to argue the contrary.

/s/ Brock A. Swartzle